Theodore **CHERUKURI,**
**M.D., Petitioner,**

v.

Donna E. **SHALALA, Secretary of the Department of Health and Human Services, Respondent.**

No. 97–4464.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 15, 1998.

Decided May 3, 1999.

John D. Preston (briefed), Chad G. Perry, III (briefed), Perry, Preston & Miller, Paintsville, Kentucky, Gregory C. Lisa (argued and briefed), Paul M. Smith, Jenner & Block, Washington, D.C., for Petitioner.

Carol Weil, Jessica A. Bowman, Office of the General Counsel, Department of Health and Human Services, Barbara C. Biddle (briefed), Carl E. Goldfarb (argued and briefed), U.S. Department of Justice, Civil Division, Appellate Staff, Washington, D.C., for Respondent.

Paul M. Smith (briefed), Jenner & Block, Washington, DC, for Amicus Curiae American College of Surgeons.

Before: MERRITT, NORRIS, and GILMAN, Circuit Judges.

## OPINION

MERRITT, Circuit Judge.

This appeal by Dr. Cherukuri, a surgeon, arises from the decision of the Secretary of Health and Human Services that the transfer of two patients violates the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd, enacted in 1985, and now given the acronym, "EMTALA." EMTALA regulates emergency room care in hospitals that accept Medicare patients and was passed ostensibly to prevent "patient dumping" of the uninsured, although its literal language reaches well beyond its stated purpose. Both the enforcement power and the adjudicatory authority under the statute are lodged in one place, the Secretary.

In this case, five auto accident patients, two with severe head injuries and internal abdominal injuries and bleeding, who were later transferred to another hospital, were brought by ambulance in the early morning hours to the emergency room of a small rural hospital in south Williamson, Kentucky, in the Appalachian Mountains on the border between Kentucky and West Virginia, 85 miles South of Huntington, West Virginia. The Williamson Hospital had no trauma center, had no equipment for monitoring the effect of anesthesia on the brain during surgery, and had a long-standing policy of not performing neurosurgery on injuries to the brain. Rather, as on the evening of the events in question, it always transferred such patients to other larger hospitals, often to St. Mary's Hospital in Huntington, a teaching hospital with a trauma center and the medical expertise and equipment to perform brain surgery.

There is no question of improper motive, "patient dumping" based on uninsured status, or other discriminatory treatment by Dr. Cherukuri in this case. It is also undisputed that the condition of the two patients did not in fact deteriorate during transfer to St. Mary's in Huntington.

The issue before us is more technical in nature. The question is whether Dr. Cherukuri, the emergency room surgeon on call that night at Williamson Hospital, should be found guilty of violating the "stabilization" language of § (b) of EMTALA because he transferred the two patients with head injuries to the trauma center at St. Mary's Hospital in Huntington (1) before operating on their stomach injuries to stop internal bleeding and (2) before receiving express consent to transfer from the physicians at the Huntington hospital. The Inspector General commenced an enforcement action to suspend the surgeon's license and assess the maximum "civil penalty" of $100,000. An administrative law judge employed by the Secretary wrote a 35,000–word opinion finding the surgeon guilty and imposing a fine of $100,000. The "Departmental Appeals Board" in the Office of the Secretary declined to review or comment on the deci-

sion and made it final and binding, subject to review in the Court of Appeals.[1]

The ALJ concluded that the surgeon failed to "stabilize" the two patients before transfer in violation of the statute. She held in cases where there is internal bleeding that "stabilization" necessarily requires an abdominal operation by the surgeon on the two patients before transfer. This legal conclusion was based in turn on a finding of fact that an anesthesiologist willing to "put the patients to sleep" was available so that surgery could proceed. After oral argument, a careful reading of the transcribed testimony of each witness and a review of the extensive record, we decline to enforce the order. We set the administrative decision aside and dismiss the charges. We conclude that Dr. Cherukuri sufficiently "stabilized" the two patients to permit transfer and, alternatively, that he did not have anesthesiology available so that he could operate.

## I. The Statute

In order to boil the case down and separate out the relevant from the voluminous extraneous facts, it is necessary first to analyze closely the applicable language of subsections (b), (c), (d), and (e) of EMTALA.

Subsection (a) of EMTALA is not at issue here. It simply requires that emergency room patients may not be turned away but must receive "an appropriate medical screening examination within the capacity of the hospital emergency department." 42 U.S.C. § 1395dd(a). A full medical screening was performed in this case.

Sections (b), (c), (d) and (e), the critical sections in this case, regulate treatment and restrict transfer of emergency patients. Subsection (b) provides:

> (b) . . . the hospital must provide either—
>
>> (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required *to stabilize* the medical condition, *or*
>>
>> (B) for *transfer* of the individual to another medical facility in accordance with subsection (c) of this section.

*Id.* § 1395dd(b) (emphases added). Under subsection (c), a patient who "has *not* been stabilized" may be transferred (1) only upon "a certification that based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risk to the individual . . . from effecting the transfer" and (2) only if "the receiving facility . . . has agreed to accept transfer of the individual and to provide appropriate medical treatment . . . ." *Id.* § 1395dd(c) (emphasis added). Only *unstable* patients require a certification and consent of the receiving hospital. A patient who has been "stabilized" in the emergency room of the transferring hospital may be transferred to a receiving hospital without a certification, as described above, and without obtaining the express agreement of the receiving hospital. "Stabilized" patients may be transferred without limitation under the language of the statute.

In subsection (e), EMTALA's definition subsection, the word "stabilized" is defined, but the definition is not given a fixed or intrinsic meaning. Its meaning is purely contextual or situational. The definition depends on the risks associated with the transfer and requires the transferring phy-

---

1. EMTALA calls for a review by the Court of Appeals of decisions to impose a penalty. The "court shall have jurisdiction . . . to make . . . a decree affirming, modifying, remanding for further consideration, or setting aside, in whole or in part, the determination of the Secretary and enforcing the same to the ex-

tent that such order is affirmed or modified. . . . The findings of the Secretary with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive." Subsection (d) of EMTALA incorporates the above review procedures from 42 U.S.C. § 1320a–7a(e).

sician, faced with an emergency, to make a fast on-the-spot risk analysis. The definition says that "stabilized" means "that no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual." *Id.* § 1395dd(d). The bottom line is that under the language of subsections (b) and (c), including the definition of "stabilized" in subsection (e), a physician may transfer any emergency room patient to another hospital without any certifications and without the express consent of the receiving hospital if he reasonably believes that the transfer is not likely to cause a "material deterioration of the patient's condition." *Id.* Obviously a surgeon in Dr. Cherukuri's position must weigh what he can do for the patient at his hospital versus the services available at the receiving hospital, as well as the present condition of the patient and the risk that he will get worse during the transfer.[2]

■ Section (d) defines the burden of proof for the government when prosecuting a physician in a civil penalty enforcement action. Subsection (d)(1)(B) provides for a "civil money penalty" against "any physician who is responsible for the ... transfer of an individual ... and who negligently violates a requirement of this section, including a physician who ... signs a certification ... that the medical benefits reasonably to be expected from a transfer to another facility outweigh the risks associated with the transfer, *if the physician knew or should have known that the benefits did not outweigh the risks.*" *Id.* § 1395dd(d)(1)(B) (emphasis added). In order to prove a transfer violation under sections (b), (c) and (e), the government

must show in a civil penalty case not only that the transferred patient was not "stabilized" and not accepted by the receiving hospital. It must show that the doctor was "negligent" in transferring the patient in the sense that, under the circumstances, "the physician knew or should have known that the benefits [of transfer] did not outweigh the risks."

Counsel for Dr. Cherukuri argue that he should be exonerated not only because he did not violate the literal language of the stabilization and transfer provisions of EMTALA, but also because this is a "patient dumping" statute and we should read into section (b) a requirement of discrimination based on insured status, ability to pay or other class based intent. The Supreme Court in *Roberts v. Galen of Virginia, Inc.,* —— U.S. ——, 119 S.Ct. 685, 142 L.Ed.2d 648 (1999), recently rejected the view that § (b) of EMTALA implicitly incorporates an "improper motive" test. The Supreme Court opinion says that the statutory text should not be read to include qualifications not imposed by its plain language, but we leave to another day the question whether the *Roberts* opinion precludes a reading of the statute that incorporates a discrimination requirement. We need not reach this issue because, as we explain below, Dr. Cherukuri did not violate the stabilization provision of EMTALA.

We agree with the position articulated in the brief filed by the Solicitor General in *Roberts* in which he stated that the definition of "stabilization" establishes an "objective" standard of "reasonableness" based on the situation at hand and "requires *merely* that a hospital stabilize pa-

---

**2.** The Fourth Circuit, in an opinion by Judge Phillips, has reached a similar conclusion that to "stabilize" for purposes of "transfer" is a relative concept that depends on the situation:

> The stabilization requirement is thus defined entirely in connection with a possible transfer and without any reference to the patient's long-term care within the system. It seems manifest to us that the stabilization requirement was intended to regulate the hospital's care of the patient only in the immediate aftermath of the act of admitting her for emergency treatment and while it considered whether it would undertake longer-term full treatment or instead transfer the patient to a hospital that could and would undertake that treatment.

*Bryan v. Rectors & Visitors of Univ. of Virginia,* 95 F.3d 349, 352 (4th Cir.1996).

tients within the staff and facilities at the hospital." The Solicitor General cites the statement of Senator Bob Dole, a co-sponsor of EMTALA, who says that "a hospital is charged *only* with the responsibility of providing an adequate first response to a medical crisis" which "means the patient must be evaluated and, at a minimum, provided with whatever medical support services and/or transfer arrangements that are consistent with the capability of the institution and the well-being of the patient." 131 Cong. Rec. 28569 (1985).

## II. The Emergency Room Situation, The Transfer, and the Application of the Law to the Facts

At about 3:30 on Sunday morning, September 15, 1991, five injured auto accident victims were brought to the Williamson Hospital. Dr. Hani, the emergency room doctor, and registered nurse Judy Hatfield were then on duty in the emergency room. They immediately called Dr. Cherukuri, the general surgeon on-call that night, a man in his mid–50s with many years experience and with a good reputation in his profession prior to this prosecution.[3] He was originally trained in India and received extensive further training in surgery in the New York University medical system. He came immediately to the emergency room. Pat White, the senior nurse who was in charge of administration of all of the departments at the hospital that night, also came immediately. Dr. Cherukuri and nurses White and Hatfield were at the hospital for the next six hours dealing with the five patients. The two nurses both testified that the small emergency room was "almost overwhelmed" by the situation. Two of the accident victims, Crum and Mills, were critically injured, another very seriously injured and two more were hurt in the accident and needed treatment.

As soon as Dr. Cherukuri arrived, he spent about 30 minutes diagnosing the injuries. He found Crum to be nonresponsive with massive cranial injuries, very low blood pressure and fixed dilated pupils indicating that the brain may be near death. He made a small incision in Crum's stomach and found internal bleeding. He tentatively concluded that Crum might not survive but would need immediate blood and other liquid transfusions to stabilize his blood pressure. He set that treatment in motion. He also concluded at that time he would have to operate on Crum's abdomen to find and stop the bleeding before transferring him to Huntington for brain surgery.

He found Mills to be responsive but unconscious with a serious head injury and low blood pressure. A similar stomach incision showed internal bleeding. After taking similar steps to administer blood and liquids, he examined the other three patients. He tried unsuccessfully to find another surgeon to come in to help with the five patients.

After four hours of treatment, Crum and Mills, the two patients with cranial injuries, were transferred by ambulance to Huntington. Time was lost trying without success to get a helicopter in to transfer the two patients to Huntington. Due to heavy fog in the river valley where the Williamson Hospital is located, the helicopter pilots finally advised that they were afraid to land in this mountainous country. Transfer was also delayed because of difficulties in finding an anesthesiologist.

### A. Anesthesiology

It is undisputed that Dr. Cherukuri determined by 4:00 A.M. that it would be best to operate on both Crum and Mills to stop the internal bleeding so that he could raise their blood pressure to assure a sufficient blood supply to the brain and other

---

**3.** Williamson Hospital Administrator Charles Glover stated that over the many years he served as Administrator "no disciplinary action or derogatory information on Dr. Cheru-

kuri" came to his attention and the Doctor was "a caring, prompt responding, well trained general surgeon."

organs. But he was unable to do so for the next three hours because Dr. Thambi, the anesthesiologist on call, advised strongly against operating and did not come to the hospital. He testified that he advised Dr. Cherukuri and nurse White that the patients should be immediately transferred to St. Mary's Hospital in Huntington. He testified that he advised repeatedly and adamantly that administering anesthesia for the abdominal surgery was too risky because they had no equipment to monitor its effect on the pressure in the brain. Dr. Thambi himself testified that he would only have provided anesthesia "under protest" if ordered to do so.

Dr. Cherukuri and Pat White testified that over the next two hours each requested Dr. Thambi by phone several times to come to the hospital but he maintained that anesthesia was out of the question and did not come. They tried to locate other anesthesiologists during this period but were unsuccessful. Finally, when Dr. Thambi came two and a half hours later, he testified that he told the parents of the patients that they must be transferred to Huntington for surgery because it could not be performed at Williamson. He continued to advise the staff that anesthesiology on the brain injured patients was out of the question. All witnesses who heard and observed Dr. Thambi so testified. No one testified to the contrary.

■ While recognizing that Dr. Thambi had made his position very clear that he did not intend to provide anesthesiology because it might kill the brain injured patients, the ALJ concluded that EMTALA required the surgeon to force Dr. Thambi to perform by expressly ordering him to administer anesthesia. The ALJ states repeatedly throughout her long opinion that the law "necessarily required" Dr. Cherukuri to stop the bleeding for the patients to be considered "stabilized" under the statute and that this required Dr. Cherukuri to force Dr. Thambi against his will to administer anesthesia. Nothing in EMTALA demands such a confrontation, and for good reasons.

> Special care must be exercised in sedating parties who have sustained head injuries, as the level of consciousness is an important diagnostic and prognostic sign. It is difficult to distinguish between a desirable drug effect and the progression of intracranial pathology. Even mild drug-induced respiratory depression with its associated hypercania can result in significant elevations of the intracranial pressure.

Lewis A Coveler, *Anesthesia,* in TRAUMA 219 (Ernest E Moore et al., eds., 2d ed.1991). We thus regard the ALJ's conclusions as erroneous. Dr. Thambi testified that he probably would have administered anesthesia, if ordered, but strongly opposed it, delayed coming to the hospital for 2–1/2 hours so that the patients could be transferred and personally advised the parents not to allow surgery at Williamson but to transfer to Huntington.

### B. "Stabilization"

All witnesses in the case, as well as the ALJ, agreed that by the time the two patients were transferred by ambulance four hours after they arrived, the emergency room staff had normalized their blood pressure so that a sufficient blood supply was flowing to the organs of the body. But two witnesses, an emergency room doctor (Dr. Harrigan) and a general surgeon (Dr. Browning) testified for the government as experts that "stabilization" for transfer to another hospital could not occur, as a matter of definition, unless abdominal surgery was performed to stop the internal bleeding. They testified that the word "stabilize" in the statute has an intrinsic, *a priori* meaning requiring that patients not be transferred while internal bleeding remains. The ALJ accepted their testimony and adopted the inflexible meaning they gave to the word "stabilize" in the statute.

The two government experts, and the ALJ, viewed transfer with internal bleed-

ing as improper because it was possible that the patients could start hemorrhaging during the 1–1/2 hour ambulance trip to Huntington. Even though attendants giving blood transfusions accompanied the patients, the two government witnesses believed that the risk of "deterioration" during travel was too great. All witnesses, as well as the ALJ, agreed that in this case the two patients in fact arrived at the Huntington Hospital without further injury or deterioration, that their blood pressure and breathing remained stable and did not deteriorate, and that the travel did not further exacerbate the patients' conditions. Although Crum died later of his injuries, the evidence was that there was nothing Dr. Cherukuri, or the staff in Huntington, could have done to save him. Mills survived, recovered from his injuries and was released.

Eight expert witnesses, including Dr. Cherukuri, testified either expressly, or in effect, that "stabilize" must be given a more flexible meaning and that the on-the-spot risk analysis of Dr. Cherukuri leading to transfer was appropriate under the circumstances. Among the witnesses, who so testified in addition to Dr. Cherukuri, were Dr. Sircus Arya, the receiving surgeon at Huntington who operated on Mills and Crum when they arrived; Dr. Thambi, the anesthesiologist, who testified that from the beginning he believed that Dr. Cherukuri had no choice but to transfer; and Dr. Hossein Sakhai, a Huntington-based, Vanderbilt-trained neurosurgeon with 31 years experience, who testified that he had carefully reviewed the hospital records at Williamson and Huntington and that the transfer "should have been done" when it was done and that there was "good cause and good reason" to transfer without an abdominal operation. After going over the blood pressures of the patients in detail, he testified repeatedly on direct and cross-examination that he could find no fault with the way Dr. Cherukuri handled the problem:

If somebody had told me that there is this kind of blood pressure, even though the peritoneal lavage [operation which showed internal bleeding] was positive, I would have said that yes, let's take the risk of coming up here [to Huntington] rather than having surgery up there [at Williamson] because there could have been some serious problem in the head, that doing that [abdominal] surgery might have caused some problem.

In addition, Dr. William Aaron, a board certified "quality assurance" and peer review physician, Dr. Paul Fowler, specializing in legal medicine, R.N. Judy Hatfield, the emergency room nurse at Williamson, and Pat White, the nurse who attended Dr. Cherukuri, also testified as experts that the two patients were sufficiently stabilized to transfer and, like Drs. Arya, Sakhai, and Thambi, testified that Dr. Cherukuri had no other viable choice under the circumstances but to transfer.

■ The ALJ treatment of the testimony of Drs. Sakhai, Aaron and Fowler is clearly erroneous and must be rejected. She rules out their testimony as irrelevant because "they did not have the opportunity to observe the patients' condition," deriving "their opinions solely from a review of the medical records." JA 24–25. Yet the ALJ appears to accept fully the testimony of government witnesses Harrigan and Browning—who also "did not have the opportunity to observe the patient's condition"—that the patients remained "unstable" so long as no abdominal operation was performed. No explanation is given for the inconsistent treatment of the two government experts and the three defense experts.

Nor does the ALJ give any credence to any of the five experts on the scene who observed the patients—Drs. Cherukuri, Thambi, Arya and Nurses White and Hatfield—and who all testified, either expressly or in effect, that after blood pressure was restored the patients were sufficiently stable and that transfer was the only reasonable choice.

■ We agree with the eight witnesses—Drs. Cherukuri, Thambi, Arya, Sakhai, Aaron, Fowler, and Nurses White and Hatfield. The statutory definition of "stabilize" requires a flexible standard of reasonableness that depends on the circumstances. The two government witnesses and the ALJ erred in giving the concept a fixed meaning which necessarily, and in all events, requires an abdominal operation before transfer. Nothing in the statute so requires, and the rigidity of the representatives of the Office of the Secretary on this subject is misplaced.

■ In our view Dr. Cherukuri acted properly under very trying and difficult circumstances and should be exonerated of any wrongdoing. Certainly any possible fault does not rise to the level prescribed by § (d) of EMTALA, which states that a civil penalty can only be imposed on a doctor who "knew or should have known that the benefits [of transfer] did not outweigh the risks." 42 U.S.C. §§ 1395dd(d).

## C. The Transfer

At about 4:00 A.M., after Dr. Thambi advised Dr. Cherukuri that anesthesia should not be given to Crum and Mills, Dr. Cherukuri talked to the chief surgeon at Huntington, Dr. Arya, briefly describing the situation and his problem in finding an anesthesiologist. Dr. Arya advised him to try to find an anesthesiologist somehow and to perform an abdominal operation on each to stop the bleeding. Dr. Arya testified that he was irate when he learned later that morning that the patients were on their way by ambulance. He called Williamson and told Nurse White to recall the patients and perform the abdominal operations. He testified he was angry, suspected patient dumping and reported the incident as an improper transfer. The Administrator at the hospital in Huntington, Dr. Arya, and others who initially heard about what had happened thought that Dr. Cherukuri had violated EMTALA by transferring unstable patients without consent of the receiving hospital. On the basis of these initial complaints, the government undertook the investigation that led to this prosecution.

The Huntington Administrator and Dr. Arya both changed their minds completely once they learned the circumstances facing Dr. Cherukuri. They both had the courage to admit their error in sworn testimony and testified that their initial view was mistaken. Dr. Arya was a government witness, and the government does not seek to attack his credibility or expertise. The government argues, and the ALJ found, that Dr. Cherukuri lied when he told Nurse White that he had received permission from Dr. Arya to transfer the patients to St. John's in Huntington. Although it is true that Dr. Cherukuri did not have express permission to transfer, the record does not quite bear out a conclusion that he acted in bad faith and intentionally misrepresented the situation. In answer to a question by government counsel on direct examination, "after having this conversation [about 4:00 A.M. with Dr. Cherukuri] what was your expectation of what should occur before transfer," Dr. Arya gave this answer:

> Difficult for me to say what was going on in the other side. I thought that he would probably find a way to take care of the patient [by operating]. At the same time it is conceivable he was so desperate to do something, he sent the patient over. That is quite conceivable to me.

Trans. 310. This answer states, contrary to the finding of the ALJ, that Dr. Arya's "expectation" was that "it is quite conceivable to me" that Dr. Cherukuri might be so "desperate" as to send "the patient over." This testimony from the government's own witness does not support the finding that Dr. Cherukuri lied.

Dr. Arya then further testified:

Q. Now, if I understand it, both of these patients made it to you and were alive and you operated on both of them?

A. Yeah.

Q. And you got good results with your abdominal surgery on both of them?

A. Yes.

Q. But that this Sean Crum was, as you explained to the Judge, in answer to her question, for all practical purposes, beyond help because of his brain damage?

A. That is correct, yeah.

Trans. 314.

On cross-examination, Dr. Arya testified that he is now "sympathetic to him [Dr. Cherukuri] because after all the facts, I knew that he was in a tough situation, so it looked like he had no choice, what he did." (Trans. 318.) The ALJ then took over the questioning:

DR. ARYA: .... You have a patient, and you need to operate, but anesthesia doesn't want to put him to sleep, I don't know what choice you have. I kept saying that.

It happened to me. I have a patient, anesthesia wouldn't put him to sleep, I cannot put him to sleep myself, I don't have the license.

JUDGE LEAH: But would you just transfer the patient?

DR. ARYA: You have to, you have to do something.

JUDGE LEAH: Wouldn't you get the consent of the surgeon who is supposed to be receiving, first?

DR. ARYA: Yeah, but that comes more like paperwork. Bear in mind, you have to do something with the patient, he is dying, and nobody wants to put him to sleep, and the other doctors say not to send the patient, you have to make the decision. And he made the decision to send the patient over.

It is not nice choices, but I don't know what other choice he had.

JUDGE LEAH: So you think the consent of the receiving surgeon and the receiving hospital are merely paperwork?

DR. ARYA: No, in fact, they are very, very important. But he is in the position—you have the patient, you need a surgeon, anesthesia people don't want to put him to sleep, what can he do? He could have gone one more time to the phone, but the problem was that I thought after our conversation, maybe he [should] find a way to operate.

So he couldn't find a way, and he sent the patient over. *But, I mean, I wouldn't blame him for sending the patient over, because the patient would have died there without surgery.* At least, if you send him over, we could operate and so on and so on.

(Trans. 323, emphasis added.)

The ALJ does not mention this exculpatory testimony in her long opinion repeatedly condemning Dr. Cherukuri, nor does she mention that Dr. Arya said he believes that Dr. Cherukuri saved Mills' life by keeping him alive and transferring him under extremely difficult circumstances.

Therefore, we conclude that the ALJ did not apply the proper meaning of "stabilization" and hence the proper standard for transfer and seriously erred in concluding that anesthesiology was available. It is unfortunate that the errors we have uncovered were not caught earlier in the administrative process. When the administrative "Review Board" established to administer EMTALA cases chooses without explanation to make an ALJ decision in an important case binding without review, the burden on the Court of Appeals to comb the record is substantially increased. We respectfully suggest that the Board should review cases like this one closely and should not simply pass them on to a federal appellate court without providing a reasoned disposition of the objections raised by the parties. Our own close review of the record clearly shows that the decision is not supported by substantial evidence on the record as a whole, does not justify the legal conclusion made by the ALJ that Dr. Cherukuri "knew or

should have known that the benefits [of transfer] did not outweigh the risks" (§ 1395dd(d)(1)(B)), and accordingly must be set aside.