Stephen BOWDEN, By and Through his next friend, Carolyn BOWDEN, Plaintiff,

v.

WAL–MART STORES, INC., et al., Defendants.

Civil Action No. 99–D–880–E.

United States District Court, M.D. Alabama, Eastern Division.

Nov. 29, 2000.

Donald R. Harrison, Harrison & Edmondson, LLC, Dadeville, AL, for Plaintiff.

Marda W. Sydnor, Parsons, Lee & Juliano, Birmingham, AL, for Wal–Mart Stores.

James Eugene Williams, James Flynn Mozingo, Melton, Espy, Williams & Hayes, Montgomery, AL, for Tallassee Community Hospital.

Walter J. Price III, Huie, Fernambucq & Stewart, Birmingham, AL, for Montgomery Regional Medical Center.

## MEMORANDUM OPINION AND ORDER

DE MENT, District Judge.

Before the court are three separate motions for summary judgment. Tallassee Community Hospital, Inc. ("TCH") filed its motion on May 19, 2000. Wal–Mart Stores, Inc. ("Wal–Mart") filed its motion on May 24, 2000. Montgomery Regional Medical Center ("Montgomery Regional") filed its motion on September 25, 2000. Plaintiff has timely responded to each. After careful consideration of the arguments of counsel, the relevant law, and the record as a whole, the court finds that TCH's motion is due to be granted, Wal–Mart's motion is due to be granted in part and denied in part, and Montgomery Regional's motion is due to be denied.

## I. JURISDICTION AND VENUE

The court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 42 U.S.C. § 1395dd (Emergency Medical Leave and Active Labor Act), and 28 U.S.C. § 1367 (supplemental jurisdiction). Neither party contests personal jurisdiction or venue.

## II. SUMMARY JUDGMENT STANDARD

The court construes the evidence and makes factual inferences in the light most favorable to the nonmoving party. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment is entered only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). At this juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted).

This determination involves applying substantive law to the substantive facts that have been developed. A dispute about a material fact is genuine if a reasonable jury could return a verdict for the nonmoving party, based on the applicable law in relation to the evidence presented. See id. at 248, 106 S.Ct. 2505; Barfield v. Brierton, 883 F.2d 923, 933 (11th Cir.1989). The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. See Celotex, 477 U.S. at 323, 106 S.Ct. 2548. The burden then shifts to the non-moving party, which "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). An action will be dismissed when the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. See id. at 587, 106 S.Ct. 1348.

## III. FACTUAL BACKGROUND

A helium balloon, a glow-in-the dark plastic star, and a hospital conspired to rob Plaintiff Stephen Bowden ("Plaintiff") of much of his eyesight, just a few days after he celebrated his eighth birthday. About a year before this tragedy, Stephen's grandmother had purchased a package of Glow Power Wonder Glow Stars from Wal–Mart. The plastic stars are sold in a package along with some adhesive putty, which allows them to be affixed to ceilings, walls, and other surfaces. The package labeling states that the product is a "Super Kit Play Set" that is designed for consumers over three years of age. (Wal–Mart Mot. Ex. 1.) Stephen has lived with his grandparents since he was an infant, when his parents divorced and his mother committed suicide. The issue is whether the acts of any of the Defendants proximately caused his injuries.

After Stephen's grandparents purchased the stars, the family stuck them to the ceiling in his bedroom. The adhesive stars eventually began to fall to the floor. On September 15, 1997, Stephen had a birthday party with friends and family at a local hotel. Stephen's grandparents brought a bunch of helium balloons back to their house and set some of them free in Stephen's bedroom. A few nights later, before Stephen went to bed, he picked up one of the stars and pressed it against one of the balloons. The balloon exploded, propelling the star through the air with such force that it punctured the cornea and retina in Stephen's left eye. (Wal–Mart Mot. at 1–6.)

Stephen's family dashed over to TCH, the nearest hospital. Upon arriving at the hospital's emergency room, Stephen was taken immediately to the trauma unit. He was examined without delay by Dr. David Streeter, who administered treatment and arranged to transfer Stephen to another facility, where he could be seen by an ophthalmologist. Stephen's grandparents, however, insisted that Stephen be seen at a larger facility in Montgomery. (Streeter Aff.) They left TCH and drove to Montgomery Regional. Stephen's grandmother presented an attendant at Montgomery Regional with her Medicaid card. The attendant told Ms. Bowden, "I'm sorry. I cannot see where this is an emergency. You'll have to wait four to six hours and we will not treat it as an emergency." (2d Am.Compl.¶ 25.) Because Montgomery Regional would not treat Stephen's serious injury, the Bowdens had no choice but to proceed to another hospital, where they were advised to transport Stephen to a specialized eye care facility in Birmingham. (Id. ¶ 26.) Many hours later, Stephen received the comprehensive treatment to which he is entitled as a human being. This civil action arises out of the series of negligent acts and omissions that occurred prior to that point.

## IV. DISCUSSION

### A. Wal–Mart

The court begins by addressing Plaintiff's products liability claims against Wal–Mart. Plaintiff's Amended Complaint [1] alleges that Wal–Mart proximately caused his ocular injuries "under the following rules of liability," including negligence and wantonness in the design, manufacture, distribution, inspection, sale, and storage of the stars that exploded the helium balloon in his bedroom and punctured his retina. (Am Compl. ¶¶ 38, 40(a)-(f).) He also alleges that Wal–Mart failed to warn consumers of the "inherent danger of this product and to carefully warn how it must be used." [2] (Id. ¶ 40(g)). In moving for summary judgment, Wal–Mart argues that there is no causal relationship between Plaintiff's injuries and Wal–Mart's actions. With respect to Plaintiff's allegation of negligent design, sale, and distribution, the court disagrees. In all other respects, however, Wal–Mart's motion for summary judgment is due to be granted.

A federal court exercising supplemental jurisdiction over state law claims applies the laws that would have been applied by that state's supreme court. See Erie R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Under Alabama law, negligence and wantonness claims require a showing of: (1) a duty to a foreseeable plaintiff; (2) breach of that duty; and (3) proximate causation of injury. See Crowne Investments, Inc. v. Bryant, 638 So.2d 873, 878 (Ala.1994). To establish wantonness,

---

1. All of these allegations are repeated without alteration in a Second Amended Complaint, (2d Am.Compl.¶¶ 33–38), which substituted another Defendant in the case. See infra Part IV.C. Wal–Mart filed its Motion prior to that amendment, and it has not supplemented its pleadings in the interim.

2. The court construes the Amended Complaint as alleging claims for failure to warn and inadequate warning. See FED. R. CIV. P. 8(f).

Plaintiff must additionally show that Defendant acted intentionally, consciously, or with reckless indifference. *See Rommell v. Automobile Racing Club of Am.*, 964 F.2d 1090, 1096 (11th Cir.1992) (applying Alabama law). Foreseeability alone cannot give rise to an inference of the scienter necessary to sustain a claim of wantonness. *See id.*

■ On issues of proximate causation, the ultimate question is whether the plaintiff's injury is "a natural and probable consequence of the negligent act or omission which an ordinarily prudent person ought reasonably to foresee would result in injury." *Vines v. Plantation Motor Lodge*, 336 So.2d 1338, 1339 (Ala.1976). The question of proximate cause is typically one for the jury to decide. *See Davison v. Mobile Infirmary*, 456 So.2d 14, 24 (Ala. 1984). Indeed, a court should grant summary judgment only when "there is a *total lack of evidence* from which the factfinder may reasonably infer a direct causal relation between the culpable conduct and the resulting injury." *Id.* (emphasis supplied).

### 1. Negligent design, sale, and distribution

■ The court first addresses Plaintiff's allegation that the stars were defective and unreasonably dangerous. A defective product is "one that is not fit for its intended purpose or that does not meet the reasonable expectations of the ordinary consumer." *Beam v. Tramco, Inc.*, 655 So.2d 979, 981 (Ala.1995). Some products are so poorly and negligently designed that they should not be sold. The issue is whether the product is safe or dangerous when used as intended. *See Casrell v. Altec Indus., Inc.*, 335 So.2d 128, 133 (Ala.1976). "Whether a product is 'unreasonably dangerous' is for the trier of fact, just as negligence, vel non, is in a traditional negligence case." *Id.* Put another way, "a product is unreasonably dangerous if it is dangerous to an extent beyond which would be contemplated by the ordinary consumer who purchases it with the ordinary knowledge common to the community as to its characteristics." *Id.* at 133 n. 2 (quoting *Welch v. Outboard Marine Corp.*, 481 F.2d 252, 254 (5th Cir. 1973)).

■ Initially, the court finds that there is a question of fact whether the stars were being used as intended. While Wal-Mart points to labels on the product's packaging and argues that the stars were intended to be attached to "the wall or the ceiling," Plaintiff responds that the same packaging identifies the stars as part of a "Super Kit Play Set" that "includes reusable adhesive putty." (Wal-Mart Mot. Ex. 1.) In addition, Plaintiff points out that the product's packaging contains indicia that the stars are specifically intended for use by children. (*Id.*) Thus, Plaintiff argues that a jury could find that the adhesive stars are designed and marketed for sale to children who would "play" with them, perhaps by sticking them on places other than walls or ceilings. The court agrees, and finds that there is sufficient evidence for a rational jury to conclude that the stars were being used in their intended, usual, and customary manner. *See, e.g., Ford Motor Co. v. Rodgers*, 337 So.2d 736, 739 (Ala.1976) (question of intended use is question of fact).

■ Additionally, the court rejects Wal-Mart's argument that Plaintiff's injuries were unforeseeable. On the one hand, as Wal-Mart recognizes, Plaintiff's grandparents testified that they did not foresee such an injury. But on the other hand, as Plaintiff has noted, such injuries might well have been reasonably foreseeable to a reasonably prudent person—and that is the appropriate inquiry. *See Vines*, 336 So.2d at 1338. Plaintiff's grandparents might be poor risk analysts, with an inability to foresee injuries that might be evident to their reasonably prudent neighbors. There is nothing to cast doubt upon this inference, anyway, and the burden rests on Wal-Mart, as the party moving for summary judgment, to show the ab-

sence of a genuine issue of material fact. *See* FED. R. CIV. P. 56(c). After examining the glow-in-the-dark stars and hearing the testimony offered at trial, a jury might well find in Wal–Mart's favor. But it might not. In any event, "[w]here the facts, upon which the existence of a duty depends, are disputed, the factual dispute is for resolution by the jury." *Bush v. Alabama Power Co.*, 457 So.2d 350, 354 (Ala.1984) (quoting *Alabama Power Co. v. Alexander*, 370 So.2d 252, 254 (Ala.1979)). In this case, the court finds that the record contains sufficient evidence for a jury to find that Plaintiff's injuries were foreseeable and were proximately caused by the stars sold by Wal–Mart.

■■■■■ Finally, the court rejects Wal–Mart's argument that the risk of injury was so open and obvious that Wal–Mart is entitled to summary judgment. A defendant can raise the issue that the danger was open and obvious, provided that the consumer "knows not only that his conduct involves a risk [of injury], but also the extent of this risk." *Frantz v. Brunswick Corp.*, 866 F.Supp. 527, 534 (S.D.Ala.1994) (applying Alabama law). To say that a product's risks were open and obvious is another way of saying that Plaintiff assumed the risk of injury. *See id.* In other words, "[i]f the user or consumer discovers the defect and is aware of the danger, and nevertheless proceeds unreasonably to make use of the product and is injured by it, he is barred from recovery." *Hicks v. Commercial Union Ins. Co.*, 652 So.2d 211, 219 (Ala.1994).

■■■■■ The "open and obvious" defense requires proof of three elements: (1) knowledge by the plaintiff of the condition; (2) appreciation by the plaintiff of the danger or risk posed by that condition; and (3) a voluntary, affirmative exposure to the danger or risk. *See Rodgers v. Shave Mfg. Co.*, 993 F.Supp. 1428, 1437 (M.D.Ala.1998) (quoting *Reynolds v. Bridgestone/Firestone, Inc.*, 989 F.2d 465, 470 (11th Cir. 1993) (applying Alabama law)). "A general awareness of danger is not sufficient to

establish that one has assumed the risk of injury." *Id.* The analysis is a subjective one, and the factfinder is generally who determines whether the plaintiff had actual awareness of the risky condition. *See id.* Summary judgment is inappropriate if circumstantial evidence creates a genuine issue of material fact as to whether, at the time of the accident, Plaintiff was specifically aware of the nature and extent of the danger, and whether he assumed the risk of injury from using the product. *See id.*

*Frantz* provides a standard illustration of how Alabama courts treat this issue. The plaintiff in *Frantz* was injured in a boating accident when he took his hands off the steering wheel to avoid being hit in the face by a dip net that flew up from the front of the boat. *See Frantz*, 866 F.Supp. at 529. The court found that the plaintiff "knew not to take his hands off the steering wheel, although there is no evidence presented to suggest that he knew the full range of consequences of doing so." *Id.* Thus, the court denied the motion for summary judgment because Alabama law's "open and obvious" rule bars recovery "only when the plaintiff knows not only that his conduct involves a risk, but also the extent of this risk." *Id.* at 534.

■■■ Similarly, in this case, the record does not reflect that Plaintiff was aware of the danger posed from affixing the stars to helium balloons, as demonstrated by his response to a question by defense counsel:

Q: But you just had an accident because you didn't know that you shouldn't do it, right?

A: Yes, ma'am.

(Def. Ex. 4 at 40.) It goes without saying that one cannot knowingly, intelligently, and voluntarily embrace the consequences of an unknown risk. Moreover, even if Plaintiff (an 8–year–old child at the time) understood that he might suffer some type of injury from his actions, there is a genuine factual dispute as to whether Plaintiff assumed the full extent of the risk of puncturing his retina with such force that

he would lose a significant portion of his eyesight.[3] *See Frantz*, 866 F.Supp. at 534. The court expresses no opinion on whether Plaintiff will be able to prove his case at trial. *See Rivers v. Stihl, Inc.*, 434 So.2d 766, 772–73 (Ala.1983). However, after drawing all reasonable inferences in Plaintiff's favor, the court finds that summary judgment is due to be denied on the claims of negligent design, distribution, and sale.[4] *See* 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2729 at 536 (3d ed.1998) (summary judgment should be denied in negligence and products liability cases unless it is "perfectly clear that there are no issues" in dispute) (quoting *Pierce v. Ford Motor Co.*, 190 F.2d 910, 915 (4th Cir.1951)).

#### 2. Remaining claims

The remainder of Wal–Mart's motion, however, is due to be granted. First, it shall be granted to the extent that Plaintiff seeks to advance a theory of negligent entrustment. The court need not delve into the merits of this eleventh-hour claim, for even after construing the pleadings liberally, the court finds that Wal–Mart had no notice that it might be pursued. *See Aikens v. Banana Republic*, 877 F.Supp. 1031, 1037–38 (S.D.Tex.1995). Second, the motion shall be granted as to Plaintiff's allegations that Wal–Mart negligently or wantonly manufactured, warned, inspected, or stored the stars that injured his eye. Wal–Mart has sufficiently pointed out an absence of evidence to support each of these claims. Plaintiff's subsequent responses illuminate no evidence suggesting that a genuine factual dispute remains for trial. While his briefs (and they are truly brief—less than five pages each) lay out the elements of negligence nicely, the opinions, allegations, and conclusory statements of counsel do not substitute for evidence. *See LaChance v.*

*Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir.1998); *Pelletier v. Zweifel*, 921 F.2d 1465, 1507 (11th Cir.1991). It is not for the court to manufacture arguments on Plaintiff's behalf. *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.1995). Summary judgment is due to be granted accordingly.

### B. Tallassee Community Hospital

The court now turns to Tallassee Community Hospital's ("TCH") motion for summary judgment. Plaintiff contends that the hospital is liable because Dr. Streeter, its on-call physician: (1) committed medical malpractice under the Alabama Medical Liability Act ("AMLA"), *see* ALA. CODE § 6–5–480 *et seq.* (1975); and (2) failed to give Plaintiff the medical treatment required under the Emergency Medical Treatment and Active Labor Act ("EMTALA"). *See* 42 U.S.C. §§ 1395dd(a)-(b). The court finds no basis for imposing liability against TCH. Therefore, its motion is due to be granted.

#### 1. Federal law (EMTALA)

When a patient with an emergency medical condition presents to a hospital with an emergency medical center, EMTALA imposes two basic duties upon the hospital: (1) a duty to screen the patient; and (2) a duty to stabilize his or her condition or arrange for an appropriate transfer to another facility. As the court has found previously:

> [T]hose hospitals with an emergency medical department must provide an appropriate medical screening to determine whether an emergency medical condition exists for any individual who comes to the emergency medical department requesting treatment. A hospital fulfills this duty if it utilizes identical screening procedures for all patients complaining of the same condition or exhibiting the same symptoms. An ad-

---

**3.** Likewise, and even more significantly, the record does not reflect that Plaintiff's grandparents fully appreciated the nature and extent of the risks associated with the stars.

**4.** The claims of negligent sale and distribution are ancillary to the claim of negligent design.

ditional duty arises if an emergency medical condition is discovered during the screening process .... When an individual is diagnosed as presenting an emergency medical condition, the hospital must provide ... that treatment necessary to prevent the material deterioration of the individual's condition or provide for an appropriate transfer to another facility.

*Gardner v. Elmore Community Hosp.,* 64 F.Supp.2d 1195, 1201 (M.D.Ala.1999) (quoting *In re Baby K,* 16 F.3d 590, 593–94 (4th Cir.1994)). A patient's condition is stabilized if "no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual." *Cherukuri v. Shalala,* 175 F.3d 446, 450 (6th Cir.1999); *see also Deron v. Wilkins,* 879 F.Supp. 603, 608 (S.D.Miss.1995).

Plaintiff concedes that he was accurately and adequately screened by Dr. Streeter with all deliberate speed. Dr. Streeter diagnosed Plaintiff's injury and determined that it required expert medical care that could not be provided at the hospital. Dr. Streeter informed Plaintiff's grandparents of his desire to transfer Plaintiff to Alexander City, where he could be examined by the closest available specialist working at the time. Yet Plaintiff's grandparents rejected the doctor's proposal, insisting that Plaintiff be seen in a "bigger hospital." Dr. Streeter tried to accommodate the grandparents' wishes and contacted a hospital in Opelika to obtain permission for Plaintiff's transfer. Before he could complete the call, however, Plaintiff's grandmother grabbed Plaintiff in her arms and left the emergency room against medical advice. Dr. Streeter followed the family to their car and pleaded with them to return to the emergency room, but his entreaties were ignored.

 Dr. Streeter did Stephen Bowden no harm. It is undisputed that Dr. Streeter placed a covering over Stephen's eye to stabilize his injury. There is absolutely no evidence suggesting that the injury would likely have deteriorated, within reasonable medical probability, if Plaintiff's grandparents had agreed to Plaintiff's transfer to a hospital in Opelika or Alexander City. *See Cherukuri,* 175 F.3d at 450. In fact, Dr. Streeter probably would have violated basic principles of patient autonomy if, after full disclosure, he had forced Plaintiff to submit to treatment against his guardians' will. *See, e.g., Ex parte Atmore Community Hosp.,* 719 So.2d 1190, 1193 (Ala.1998) (listing elements of battery). Thus, the court finds that TCH complied with EMTALA's mandates.

### 2. Alabama law (AMLA)

Plaintiff's claims under AMLA also are due to be dismissed. At the outset, however, the court rejects TCH's argument that the hospital had no legal duty to treat Plaintiff. While some unenlightened courts at the dawn of the twentieth century were reluctant to impose a duty of treatment, any legitimate grounds for such restraint have been eroded by the realities of modern life. As one commentator has explained,

> Early hospitals in the United States operated as charitable institutions, financially dependent to a large degree on philanthropic donations. As a result, courts were hesitant to pierce the veil of protection provided by the "no duty to treat" rule without simultaneously dismantling the firmly entrenched shield of charitable immunity. Until the middle of the twentieth century, the doctrine of charitable immunity was viable, widely accepted, and routinely applied, as evidenced by its adoption in more than forty states.... The doctrine, while widely accepted, was also widely criticized. [It] came under staunch attack, and by the late 1960's most state courts had abrogated the doctrine through decision and state legislatures had done the same by statute.

Christopher J. Field, Note, *Indigent Access to Emergency Care: The Patients Bleed Red, But the Hospitals Want Green,*

8 N.Y.L. SCH. J. HUM. RTS. 461, 464–65 (1991).

Indeed, "no court since 1961 has required less than stabilizing care in serious emergencies." Timothy G. Himes, Sr., *"No Dumping Allowed": Has Arizona Solved the Patient–Dumping Problem?*, 21 ARIZ. ST. L.J. 1137, 1142 (1989). Any modern support for a contrary position— which is unspeakably cruel, barbaric, and out of step with fundamental notions of liberty, equality, and justice—is the product of strained, mediocre analysis twisted from the dicta of an aberrant case. *See Harper v. Baptist Med. Ctr.-Princeton,* 341 So.2d 133, 134–35 (Ala.1976) (per curiam) (holding that hospital did not breach duty of care because victim did not suffer from serious emergency; hinting in dicta that hospital had no duty to treat). The court is somewhat surprised that TCH would rely on *Harper* to advance such a callous argument.[5] What would the hospital's public relations department think about its legal department's proclamation that Stephen Bowden is less of a human because he was born with less than other humans? That his blood, sweat, and tears are worthless? That he should, essentially, drop dead?

Large institutions all too often lose sight of their civic and moral obligations to the people who eat, sleep, work, breathe, and die in their community. There is something about the impersonal and impervious marketplace that corrupts and mangles the souls of the beancounters, bureaucrats, and barristers who most staunchly defend it. They sing the praises of the free market and argue that judicial or legislative intervention is inefficient. Perhaps their argument would have a grain of merit in an ideal world with perfect information, zero transaction costs, minimal barriers to entry, and meaningful consumer choice. But even then, judicial intervention would not necessarily be inappropriate. The common law promotes multiple values; efficiency has never been its sole aim.[6] *See,*

5. In dicta, *Harper* cites *Birmingham Baptist Hosp. v. Crews,* 229 Ala. 398, 157 So. 224 (1934), for the proposition that hospitals have no duty to treat indigent patients. *See Harper,* 341 So.2d at 134. However, as commentators have long recognized, at no time did the *Crews* court hold that a hospital has no duty to provide emergency medical care. The plaintiff in *Crews* suffered from diphtheria. *See Crews,* 157 So. at 225. The court held "that the hospital administered proper emergency treatment, and acted appropriately in following its established policy of refusing admission to persons with contagious diseases." Karen H. Rothenberg, *Who Cares: The Evolution of the Legal Duty to Provide Emergency Care,* 26 HOUS. L. REV. 21, 30 (1989); *see also Citizens Hosp. Ass'n v. Schoulin,* 48 Ala.App. 101, 262 So.2d 303, 308 (1972) (limiting *Crews* on such grounds). In any event, if *Crews* or *Harper* suggested that there is no duty to treat, their holdings were overruled more than a decade ago. *See Chandler v. Hospital Auth. of Huntsville,* 548 So.2d 1384, 1386–87 (Ala.1989).

6. In considering the arguments of counsel, the court recalls the advice given by a senior editor of Harvard University's undergraduate daily newspaper to his graduating classmates. The author wrote:

... Richard C. Marius, senior lecturer on English, reminds us that "human beings are incomplete unless they can stare out windows, seeing a world beyond what the eye can behold." Speeding along the highway between downtown offices and suburban homes, living in rooms with incredible views, we will be sheltered from America's latent racism, sexism, homophobia, poverty and moral uncertainty. It's really there. And unless we remember that many among us live sad lives of quiet desperation—and that we are who we are because someone loved us, cared for us, and lent us a guiding hand—then our entire education will have been for naught.

Sitting on the dais today, watching us enter "the fellowship of educated men and women," are some of America's most powerful and influential leaders. We've been trained to follow in their footsteps, and five years from now we will write entries for the *Class Book* detailing our material successes. At least one person, however, will step forward bravely and confess that his or her life hasn't turned out at all like expected. Our hearts will skip a beat as we wonder how our former classmate failed. The truth, of course, is that the only failure is the person who loses their [sic] moral compass, who gives up hope, who becomes part of the

*e.g., Schwartz v. Volvo N. Am. Corp.,* 554 So.2d 927, 942 n. 6 (Ala.1989) (Hornsby, C.J.) (concurring in part and dissenting in part).

In the real world, the demand for health care among indigent persons will always exceed the supply in an unregulated market. Health care is not inexpensive, and by definition it is priced beyond the means of those who cannot afford it. Thus, when left to its own devices, the "free market" gives indigent persons no hope of obtaining the treatment they need if confronted with a serious medical emergency. To be sure, some altruistic hospitals will treat the indigent without expecting compensation. But that is of little value to the person suffering from a serious emergency, who finds herself confronted with a profit-maximizing institution that denies her the treatment she so desperately needs. Even assuming that she may be within range of another hospital, time is often of the essence, and time will not be on her side.

 Access to health care should never depend upon blind luck or fortuity. Unfortunately, no reasonable person can deny that there is some degree of market failure in our imperfect world. The market does not always clear; supply does not meet demand. Yet the law does not mandate Social Darwinism. Rather, it places upon society some measure of responsibility to help to their feet those who would stumble and fall if left all alone in their journey through this world. At a minimum, Alabama law provides that a hospital can easily assume a duty to provide emergency care to all persons. *See Chandler v. Hospital Auth. of Huntsville,* 548 So.2d 1384, 1386–87 (Ala.1989); RESTATEMENT (SECOND) OF TORTS § 323 (1965). When a hospital holds itself out as willing to perform emergency treatment, the patient is quite likely to seek aid and comfort from the hospital in reliance upon those representations. The hospital cannot subsequently renege on its promise simply because the patient is indigent and the hospital is heartless. *See Chandler,* 548 So.2d at 1387; *see also Wilmington Gen. Hosp. v. Manlove,* 174 A.2d 135 (Del.1961); *New Biloxi Hosp., Inc. v. Frazier,* 245 Miss. 185, 146 So.2d 882 (1962); *Stanturf v. Sipes,* 447 S.W.2d 558 (Mo.1969); *Fabian v. Matzko,* 236 Pa.Super. 267, 344 A.2d 569 (1975).

Moreover, it is quite likely that the Alabama Supreme Court would interpret the common law as imposing a full-fledged duty upon all hospitals, at all times and in all circumstances, to provide stabilizing care to indigent persons presenting with serious emergencies. *See Chandler,* 548 So.2d at 1387–92 (Kennedy, J., concurring in result) (joined by Hornsby, C.J., and Jones, J.) The state of Alabama has a strong public policy favoring "safe and adequate treatment and care" of its citizens. ALA. CODE § 22–21–21 (1975). As the three concurring justices noted in *Chandler,* 548 So.2d at 1392, "a hospital that provides emergency services should be under a duty to provide emergency care to anyone who seeks it and is in need of it." *See also Thompson v. Sun City Community Hosp., Inc.,* 141 Ariz. 597, 688 P.2d 605 (1984); *Williams v. Hospital Auth. of Hall County,* 119 Ga.App. 626, 168 S.E.2d 336 (1969); *Richard v. Adair Hosp. Found. Corp.,* 566 S.W.2d 791 (Ky.App.Ct.1978); *Hastings v. Baton Rouge Gen. Hosp.,* 498 So.2d 713 (La.1986); *Mercy Med. Ctr. of Oshkosh, Inc. v. Winnebago County,* 58 Wis.2d 260, 206 N.W.2d 198 (1973).

The court strongly believes that if the Alabama Supreme Court was confronted with a case similar to this one, it would step boldly into the 21st century, go beyond its holding in *Chandler,* and find that a "hospital," as defined by the Alabama Code, *see* ALA. CODE § 22–21–20(1) (1975),

system instead of a voice urging—sometimes in the face of public opinion—to change it. It is of no use to profit in the world if we lose our soul . . . .

Christopher R. McFadden, *Harvard Degrees and Life Mysteries,* THE HARVARD CRIMSON (Cambridge, Mass.), June 5, 1997, at A–15.

may not deny stabilizing emergency care to any indigent person without valid cause. The Alabama Supreme Court probably would find that "valid cause" for denying treatment exists in only three possible situations: (1) the hospital is not obligated (or capable) under its state license to provide the necessary emergency care; (2) there is a valid medical reason for refusing emergency care; or (3) there is no true emergency being presented and, thus, no legitimate need for treatment. *See Thompson,* 688 P.2d at 611.

Imposition of a duty to treat would require hospitals to supply additional health care to additional patients. In raising supply to its optimal level, hospitals might pass along the costs to more wealthy consumers or to the public generally. *See* ALA. CODE § 22–21–293 (1975). This burden-shifting would be wholly moral and just. It would recognize that inequities in wealth distribution must be minimized to the extent that they oppress the most disadvantaged of society.[7] It also would recognize that each community member has certain obligations to her neighbors, given that their lives and fates are inexorably intertwined.[8] A corporation is a creature of law that amounts to nothing more than a loose collection of individuals. *See Pembina Consol. Silver Mining & Milling Co. v. Pennsylvania,* 125 U.S. 181, 189, 8 S.Ct. 737, 31 L.Ed. 650 (1888). Because the corporation avails itself of the benefits of the law, it should assume a reciprocal obligation to support the community that sustains its existence.

But this is not Sherwood Forest, where the court sits as a "goodness and niceness commission" dispensing justice as it sees fit. In the absence of extraordinarily persuasive evidence that leaves room for no reasonable doubt, the *Erie* doctrine requires that the court follow Alabama common law as it was last stated by a majority of the justices in *Chandler. See, e.g., Flintkote Co. v. Dravo Corp.,* 678 F.2d

942, 945 (11th Cir.1982) ("[i]n determining the law of the state, federal courts must follow the decisions of the state's highest court"); *Johnson v. Fleet Finance, Inc.,* 785 F.Supp. 1003, 1006 (S.D.Ga.1992). Presently, the Alabama Supreme Court is irreconcilably splintered by some of its more conservative members who simultaneously advocate both judicial restraint and judicial activism. Thus, the court cannot conclusively predict that the Court would extend *Chandler* in the well-reasoned manner suggested by the three concurring justices in that case. As a result, the court cannot expand the laws beyond their present scope. *See Flintkote,* 678 F.2d at 945.

■ Regardless, the court need not adopt the *Chandler* concurrence to find that, given the facts and circumstances in this case, TCH voluntarily assumed a duty to treat Stephen Bowden. *See Chandler,* 548 So.2d at 1387. The court also finds that TCH fulfilled its duty. As explained in previous detail, *see supra* Part IV.B.1, there is nothing to suggest that TCH and its physicians and employees breached the standard of care. *See Dews v. Mobile Infirmary Ass'n,* 659 So.2d 61, 64 (Ala. 1995). Moreover, as a general rule, liability should not attach in cases like this one, where the patient leaves the hospital against medical advice and ignores the doctor's repeated pleas to return to the emergency room. *See Brumbalow v. Fritz,* 183 Ga.App. 231, 358 S.E.2d 872, 873 (1987). For these reasons, TCH's motion for summary judgment is due to be granted.

### C. *Montgomery Regional Medical Center*

Finally, the court turns to the motion for partial summary judgment filed by Montgomery Regional Medical Center ("Montgomery Regional.") After Plaintiff and his grandparents left TCH, they drove to

---

**7.** *See generally* JOHN RAWLS, A THEORY OF JUSTICE (1971).

**8.** *See generally* MICHAEL J. SANDEL, LIBERALISM AND THE LIMITS OF JUSTICE (1982).

Montgomery Regional, where Plaintiff received only cursory treatment, if any at all. (2d Am.Compl.¶¶ 25–26.) Plaintiff has brought a negligence claim and an EMTALA claim against the hospital. In response, Montgomery Regional argues that the statute of limitations has run on Plaintiff's EMTALA claim. The court disagrees, and finds that Montgomery Regional's motion is due to be denied.

The sole argument raised by Montgomery Regional is that Plaintiff's claim is untimely filed. Thus, a brief review of this case's history is necessary to help determine the dates pertinent to this motion. Plaintiff filed his original Complaint in state court on April 6, 1999. He filed an Amended Complaint on July 21, 1999. In both instances, he identified the culpable parties as "Columbia North Ridge" [9] and several fictitious defendants believed to be associated with Columbia North Ridge. (Resp.Ex. A, B.) The case was subsequently removed to federal court.

On August 8, 2000, the court granted Plaintiff leave to amend his complaint a second time (though the first time since it had been removed).[10] While Columbia North Ridge filed an objection to Plaintiff's request, Plaintiff had already dismissed its claims against Columbia North Ridge prior to the court's ruling. In any event, the court found that any possible prejudice to any party would be eradicated by continuing the trial date, so as to allow for adequate discovery and preparation. The court ordered a continuance and granted Plaintiff leave to amend. Plaintiff filed his Second Amended Complaint on August 15, 2000. This time, he named Montgomery Regional as the hospital where he had received allegedly inadequate treatment. Montgomery Regional filed its answer and its motion for partial summary judgment shortly thereafter.

▮▮▮▮ The statute of limitations on Plaintiff's EMTALA claim has expired. Plaintiff's injuries occurred September 21, 1997, which is almost three years before he named Montgomery Regional as a defendant.[11] EMTALA claims must be filed within two years of the alleged injury, *see* 42 U.S.C. §§ 1395dd(d)(2)(C), and the statute is not tolled by Plaintiff's status as a minor. *See, e.g., Vogel v. Linde,* 23 F.3d 78, 80 (4th Cir.1994); *Brewer v. Miami County Hosp.,* 862 F.Supp. 305, 307–08 (D.Kan.1994). The issue, then, is whether Plaintiff's claim against Montgomery Regional "relates back" to his prior claim against Columbia North Ridge. If so, then it is not barred by the statute of limitations. *See* FED. R. CIV. P. 15(c).

Four requirements must be met for an amendment to relate back and for Rule 15(c) to be satisfied. First, the amended complaint must arise out of the conduct, transaction or occurrence set forth in the original pleading. Second, the proper party must have received notice of the original complaint within 120 days of its filing. Third, the proper party must not be prejudiced in maintaining a defense on the merits. Fourth, the proper party must either have known or should have known that, but for Plaintiff's mistake in identity, it would have been named in the original complaint. *See id.* Montgomery Regional contests the second and fourth elements, claiming that it had no notice or knowledge of Plaintiff's original complaint. Because the court finds that Montgomery Regional had notice and either knew or should have known of the complaint within 120 days of its filing, the motion is due to be denied.

▮▮▮▮ The second and fourth elements are complimentary. The second element

---

9. Plaintiff's Amended Complaint referred to the hospital as "Columbia North Ridge (Old St. Margaret's)." (Am Compl. ¶ 26.)

10. Plaintiff's counsel suffered a heart attack during the intervening time.

11. The substitution of a named party for a fictitious party named in a prior complaint is a change of parties, not a change of name of the original party. *See Wayne v. Jarvis,* 197 F.3d 1098, 1103 (11th Cir.1999).

is met if the two parties share some "identity of interest." Put another way, the parties must be sufficiently interrelated so that notice of an action to one would serve as notice to the other. *See, e.g., Kirk v. Cronvich,* 629 F.2d 404, 407–08 (5th Cir. 1980);[12] *Jacobsen v. Osborne,* 133 F.3d 315, 319–20 (5th Cir.1998); *Dorsey v. St. Joseph County Jail Officials,* 910 F.Supp. 1343, 1348 (N.D.Ind.), *rev'd on other grounds,* 98 F.3d 1527 (7th Cir.1996); *E.I. duPont de Nemours & Co. v. Phillips Petro. Co.,* 621 F.Supp. 310, 314 (D.Del.1985). Similarly, when a party argues that the fourth element has not been satisfied, courts apply "something akin to a reasonableness test to determine whether the party 'should have known' [it] was the one intended to be sued." 6A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE, *supra* § 1498 at 139; *see also 'Jacobsen,* 133 F.3d at 319–20; *Ratcliffe v. Insurance Co. of N. Am.,* 482 F.Supp. 759, 763 (E.D.Pa.1980). "Relation back will be refused only if the court finds that there is no reason why the party to be added should have understood that [it] was not named due to a mistake." 6A WRIGHT & MILLER, *supra* § 1498 at 139. Because the inquiry is an objective one, the court should consider the totality of the circumstances and the relevant facts at issue.

■ In this case, the court finds that the parties are sufficiently interrelated so that notice of this action to Columbia North Ridge served as notice to Montgomery Regional.[13] Columbia North Ridge has a five-person board of directors, and Montgomery Regional has a three-person board of directors. (Resp.Ex. C, D.) While Montgomery Regional and Columbia North Ridge are separate and distinct legal entities, two of Columbia North Ridge's directors—including its senior vice president—are on Montgomery Regional's board of directors. In other words, two-thirds of Montgomery Regional's board also sits on Columbia North Ridge's board. This fact weighs heavily in Plaintiff's favor. *See, e.g., Swann Oil, Inc. v. M/S Vassilis,* 91 F.R.D. 267, 269 (E.D.N.C.1981).

In addition, counsel for Columbia North Ridge also represents Montgomery Regional. *See Jacobsen,* 133 F.3d at 320 ("notice may be imputed to the new party through shared counsel.") Although counsel was not representing the two parties concurrently, his firm has represented them both in the past, and he was hired to represent Montgomery Regional shortly after Plaintiff dismissed Columbia North Ridge from this case. Given the unmistakable identity of interest between the hospitals, it is not unreasonable to infer that Montgomery Regional knew all along that it might be brought into this action. Such an inference certainly helps explain why Columbia North Ridge was so adamantly opposed to Plaintiff's request to amend his complaint in the first instance. (Doc. No. 26.) It supports the conclusion that Montgomery Regional knew or should have known that "but for a mistake concerning the identity of the proper party," Plaintiff's original claim was actually directed towards Montgomery Regional. FED. R. CIV. P. 15(c)(3).

The Federal Rules of Civil Procedure should be liberally construed to promote the resolution of claims based upon their merits. This principle holds with equal strength with respect to Rule 15. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Ratcliffe,* 482 F.Supp. at 762–63. But even if the Rules were not so flexible, the court would be venerating form over substance not to recognize the interrelationship between Columbia North Ridge and Montgomery Regional. The court finds that all of the

---

12. The Eleventh Circuit adopted as binding precedent the decisions of the former Fifth Circuit prior to October 1, 1981. *See Bonner v. Prichard,* 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

13. A party receives notice of an action when it is filed. *See Hill v. U.S. Postal Service,* 961 F.2d 153, 155 (11th Cir.1992).

prerequisites of Rule 15 have been met. Therefore, Plaintiff's Second Amended Complaint relates back to his original timely filed EMTALA claim. Accordingly, Montgomery Regional's motion for partial summary judgment is due to be denied.

## V. ORDER

Based on the foregoing, it is hereby CONSIDERED and ORDERED that the motion for summary judgment filed by Tallassee Community Hospital be and the same is hereby GRANTED. The motion for summary judgment filed by Wal–Mart Stores, Inc., be and the same is hereby DENIED with respect to Plaintiff's claim of negligent design, distribution, and sale and GRANTED in all other respects. The motion for summary judgment filed by Montgomery Regional Medical Center be and the same is hereby DENIED.