NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0917n.06
No. 12-6587

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

Oct 24, 2013

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| WILLIAM ROMINE, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| ST. JOSEPH HEALTH SYSTEM, | ) | KENTUCKY |
| d/b/a SAINT JOSEPH-MT. STERLING, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

Before:  COLE and DONALD, Circuit Judges, MARBLEY, District Judge.[*]

ALGENON L. MARBLEY, District Judge.  Plaintiff-Appellant, William Romine,

appeals the district court's grant of Defendant-Appellee's motion for summary judgment.  As a

result of an unsatisfactory experience in Defendant's emergency room, Romine brought this

action pursuant to the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42

U.S.C. §1395dd.  The district court granted Defendant's motion for summary judgment, finding

that Romine had failed to adduce evidence sufficient to establish the causal nexus between the

alleged violation and his injury.  Alternatively, the district court found that Romine's failure to

adduce evidence that Defendant acted with an "improper motive" was also a basis for granting

summary judgment.  Romine contends that both of those findings were erroneous and also

argues that the district court erred in failing to give preclusive effect to a preliminary

determination letter issued by the Centers for Medicare and Medicaid Services.  Since Romine

---

[*]The Honorable Algenon L. Marbley, United States District Judge for the Southern District of
Ohio, sitting by designation.

has not demonstrated the district court erred in any of the three decisions appealed, we AFFIRM

the district court.

I.

A. Factual Background

On August 30, 2010, Romine lacerated his hand while using scissors to open a bottle of

glue. Unable to stanch the bleeding, Romine walked to the house of his neighbor, Chuck

Newkirk, and asked Newkirk to drive him to the hospital. Newkirk drove Romine to the Saint

Joseph-Mount Sterling facility operated by Defendant, Saint Joseph Health System ("SJMS"),

approximately five minutes away. Newkirk described the bleeding as profuse. When Romine

arrived at the hospital, the towel wrapped around his hand was saturated with blood. When

Newkirk and Romine approached the emergency room receptionist's desk, the receptionist told

Romine to complete an intake form. Romine explained that he was unable to complete it

because his right hand was holding the towel over his injured left hand. The receptionist

responded with the suggestion that Newkirk complete the form. Newkirk took the form, but

then, at Romine's request, went to call Romine's stepson, Wendell Fraley. While Newkirk made

the call, Romine approached the receptionist again, and again was given a form to complete.

The receptionist informed Romine multiple times that no beds were available while Romine

insisted he did not need a bed, only an examination of his hand. Romine had spent a total of ten

to twelve minutes in the emergency room when he decided to go to a different hospital in

Winchester and departed with Newkirk. During Romine's exchanges with the receptionist, he

observed another woman behind the desk who did not speak, but Romine believed her to be a triage nurse.

Romine arrived at his home, where he had arranged to meet Fraley so that Fraley could drive him to Winchester. Fraley arrived approximately five or ten minutes after Romine. They looked at the wound and thought the bleeding was abating, so they waited. A few minutes later Fraley looked at the wound again and blood discharged towards Fraley's face. Romine wished to go to the hospital in Winchester, but Fraley was concerned the injury may be so serious that they should go to the nearest hospital, SJMS. When Romine arrived at the SJMS emergency room a second time, the reception desk was staffed by the same receptionist and nurse who had been there at Romine's first visit. Fraley informed the receptionist about Romine's injury and told her that if they removed the towel, blood would "squirt all over the place." The receptionist responded that there were no beds available and Romine would have to wait. Romine and Fraley waited a few minutes before Romine then told the receptionist that he was bleeding severely. Romine received a familiar answer: he would have to wait. After a few more minutes, a different nurse appeared and noticed Romine waiting. She removed the towel and blood spurted from Romine's wound. The nurse immediately took Romine into the emergency room for treatment. Although staff managed to arrest the bleeding temporarily, they decided that Romine needed to be airlifted to the University of Kentucky Hospital ("UK Hospital") for more treatment. Physicians at UK Hospital stopped the bleeding within five minutes of seeing Romine and stitched the wound. In the early hours of August 31, 2010, a hand surgeon replaced the

stitches with sutures.  Romine departed the UK Hospital at approximately 5:00 a.m.  Romine, a

cabinet maker, was instructed not to use the injured hand for one month, during which time he

was unable to work.

### B. Procedural Background

On August 23, 2011, Romine filed this suit against SJMS in Kentucky's Montgomery

Circuit Court.  He alleged that SJMS violated EMTALA by failing to provide him an appropriate

medical screening and by failing to stabilize his injury.  SJMS removed the suit to the federal

District Court for the Eastern District of Kentucky and, following the close of discovery, filed a

motion for summary judgment.  The district court granted the motion, a decision Romine has

now appealed to this Court.

### II.

Romine appeals the district court's grant of summary judgment to SJMS.  We have

jurisdiction to consider the appeal pursuant to 28 U.S.C. §§ 1291.

### III.

Generally, this Court reviews a district court's grant of summary judgment de novo.  *Rd.*

*Sprinkler Fitters Local Union No. 669, U.A., AFL-CIO v. Dorn Sprinkler Co.*, 669 F.3d 790, 793

(6th Cir. 2012).  Summary judgment is proper where a movant demonstrates that there is "no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed.R.Civ.P. 56(a).  A dispute is "genuine" when "there is sufficient evidence favoring

the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 249 (1986). "In considering a motion for summary judgment, a district court must construe all reasonable inferences in favor of the nonmoving party." *Id*. (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Although the burden is on the movant, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 884 (1990) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

The district court granted SJMS's motion for summary judgment on two bases: (1) Romine failed to adduce evidence to establish the necessary causal nexus between SJMS's alleged EMTALA violation and Romine's injury; and, alternatively, (2) Romine failed to adduce evidence that SJMS acted with an "improper motive." Romine contends that both of those findings were in error and also contends the district court erred in failing to give preclusive effect to a preliminary determination letter issued by the Centers for Medicare and Medicaid Services. We also note that though Romine states the district court failed to apply the appropriate standard of review on summary judgment, he cannot point to any facts which the district court failed to construe most favorably to the Plaintiff as the nonmoving party.

As a preliminary matter, we observe this Court's previous statement that Congress intended for EMTALA to address "incidents where hospital emergency rooms allegedly, based only on a patient's financial inadequacy, failed to provide a medical screening that would have

been provided a paying patient, or transferred or discharged a patient without taking steps that would have been taken for a paying patient." *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 268 (6th Cir. 1990). Hence, the primary concern was to ensure that patients manifesting emergency medical conditions would receive life-saving care, at least to the point of stabilization, irrespective of their ability to pay for it. Although EMTALA "applies to any and all patients," it is confined to emergency situations and did not create a federal general malpractice action. *Id.* When a patient arrives at a "hospital that has a hospital emergency department," EMTALA imposes three requirements upon the hospital: (1) the hospital must provide for an appropriate medical screening examination; (2) the hospital must provide necessary stabilizing treatment for emergency medical conditions; and (3) the hospital may not transfer a patient who is not stabilized (except in certain defined circumstances). 42 U.S.C. § 1395dd. Romine's complaint alleged violations with regard to both the "appropriate medical screening examination" ("appropriate screening") and stabilization elements. He did not appeal the district court's dismissal of his stabilization claim or make any arguments in his appeal brief that bear on the stabilization question, so the only issue we consider here is whether Romine did not receive an appropriate screening.

## A. Causation and Expert Testimony

This Court has previously expressed doubt as to the effectiveness of Congress's choice of the word "appropriate" in drafting EMTALA, a word that provides no guidance to the courts as to what constitutes an appropriate screening. *Cleland*, 917 F.2d at 271. In light of the purposes

of EMTALA, however, "we interpret the vague phrase 'appropriate medical screening' to mean a screening that the hospital would have offered to any paying patient." *Id*. at 268. As EMTALA is essentially a tort action, a plaintiff bears the burden of proving causation at trial. The Tenth Circuit has described a causal "nexus" which a plaintiff must establish between her injury and the alleged EMTALA violation. *Parker v. Cent. Kan. Med. Ctr.*, 57 F.App'x. 401, 406 (10th Cir. 2003). There is no bright line rule that a plaintiff must adduce expert testimony to satisfy the causation burden, though it is often helpful to a jury. This is a significant issue in EMTALA actions because prior to any EMTALA violation, a plaintiff logically must have received some injury which resulted in her seeking emergency medical attention. Lay jurors will usually have difficulty determining to what extent a plaintiff was harmed by the initial injury and to what extent she was harmed by the subsequent inappropriate care. *See, e.g.*, *id*.; *Cruz-Vazquez v. Mennonite Gen. Hosp.*, 613 F.3d 54, 56 (1st Cir. 2010) ("expert testimony is generally required to assess certain elements of an EMTALA claim"). Yet, there are instances where a jury can determine that without the benefit of expert testimony. For instance, in *Morin v. Eastern Maine Medical Center*, a pregnant plaintiff suffered psychiatric trauma when the treating physician sent her home to deliver a fetus which he had determined to be deceased in utero, rather than providing further treatment in the hospital. 779 F.Supp.2d 166 (D. Me. 2011). In that case, jurors could determine that the physician's conduct had harmed the plaintiff without having to hear expert testimony. The court in *Morin* distinguished the facts of that case from a case where a plaintiff arrived at the hospital with chest pains consistent with a myocardial

infarction and observed that "[w]hether the failure to screen, not the natural progress of [plaintiff's] condition, caused the need for heart surgery was a technical medical question requiring expert testimony." *Id.* at 189.

Romine's injury presents a case more akin to the case of a patient arriving at the hospital already experiencing chest pains than to the case of an expectant mother forced to leave the emergency room to deliver a stillborn fetus. As in the former example, Romine had suffered an injury, severe laceration, which was in no way caused by SJMS or its staff. To the extent that Romine suffered harm from SJMS's delay in treating him, there is no evidence in the record to allow a jury to decide how much harm was caused by the initial laceration and how much was caused by the treatment delay. Romine does not appear to have suffered permanent damage; his primary harm was missing one month of work. If he had provided testimony from a physician that but for the delay Romine would have missed only two weeks of work, a jury would have an evidentiary basis for finding SJMS caused Romine harm in excess of that caused by the laceration. Here, without such evidence, the jury's only recourse to differentiate the harm caused by the laceration from the harm caused by inadequate treatment would be impermissible speculation. Thus, while medical expert testimony is not always needed to prove causation in EMTALA suits, it is necessary in cases such as Romine's where, to a significant extent, Romine's harm resulted from the initial injury. Discovery ended without Romine having adduced any such medical expert testimony, leaving him no way to satisfy his burden to prove causation at trial. Hence, the district court did not err in granting SJMS's motion for summary

judgment on the basis that Romine had failed to adduce evidence of causation.

## B. Requirement of Showing Improper Motive

Although Romine's failure to adduce evidence demonstrating causation alone is a sufficient basis for the district court's grant of summary judgment, the district court also found, alternatively, that summary judgment for SJMS was proper because Romine failed to adduce evidence that SJMS acted with an "improper motive." In this circuit, *Cleland* first gave attention to the significance of a hospital's motive in an EMTALA action. While the *Cleland* panel held that EMTALA protected all patients, not just the indigent, it was also concerned that EMTALA not be used as a federal general malpractice cause of action, contrary to the intent of Congress:

> We believe that the terms of the statute, specifically referring to a medical screening exam by a hospital "within its capabilities" precludes resort to a malpractice or other objective standard of care as the meaning of the term "appropriate." Instead, "appropriate" must more correctly be interpreted to refer to the motives with which the hospital acts. If it acts in the same manner as it would have for the usual paying patient, then the screening provided is "appropriate" within the meaning of the statute.

> This result does not constitute a backdoor means of limiting coverage to the indigent or uninsured. A hospital that provides a substandard (by its standards) or nonexistent medical screening for any reason (including, without limitation, race, sex, politics, occupation, education, personal prejudice, drunkenness, spite, etc.) may be liable under this section. Similarly, a discharge that to the knowledge of those conducting it left a patient with an "emergency medical condition" in an "unstable" condition would be actionable.

*Cleland*, 917 F.2d at 272. As this dicta demonstrates, in *Cleland* we sought to ensure all patients were treated equally, protected from any prejudices held by a hospital or its employees. Significantly, however, we did not impose a standard of care. *Cleland* held only that all patients

arriving at emergency rooms must receive substantially the same standard of care. Thus, for an

EMTALA plaintiff in the Sixth Circuit to show that she did not receive an appropriate screening,

she must adduce some evidence that her screening differed in some way from that given to other

patients, and the difference was improperly motivated. Common sense dictates that a hospital

should not be penalized for differentiating between patients based on proper motives. A proper

motive would be, for instance, that one patient presented a more serious condition than another

and merited a more thorough or more expedited screening for that reason.

Other circuits have diverged from this Court in finding that an EMTALA plaintiff need

not adduce evidence of a defendant's improper motive, but *Cleland* remains the law of the Sixth

Circuit. *Roberts v. Galen of Va., Inc.*, 525 U.S. 249, 253 n.1 (1999). In *Roberts*, the Supreme

Court explicitly left undisturbed *Cleland*'s requirement that a plaintiff must demonstrate an

improper motive under 42 U.S.C. §1395dd(a). *Id.* at 253. Romine does not contend that he has

adduced any evidence that SJMS acted with an improper motive; rather, he attempts to

distinguish his case from *Cleland*. Romine contends that *Cleland* does not control his case

because the Centers for Medicare and Medicaid Services ("CMS") issued Romine a "preliminary

determination letter", indicating that SJMS had violated the emergency care obligations of 42

C.F.R. § 489.24. In the next section, we address the significance, if any, of the CMS letter.

Here, it suffices that Romine has not identified a single case in which a CMS letter, or even a

subsequent final decision from CMS, was held to have any legal significance in an EMTALA

case. Furthermore, Romine does not explain how the failure of SJMS to provide a certain

quality of emergency care has any bearing on its motive. We could imagine any number of reasons why SJMS might have provided Romine with substandard care, but unless it did so with an improper motive, no action lies under EMTALA. Simply, Romine has not persuasively argued the CMS letter legally or factually distinguishes his case from *Cleland*, or otherwise excuses his failure to adduce evidence that SJMS acted with an improper motive.

Alternatively, Romine asks us to "revisit" the *Cleland* decision. As a preliminary matter, we note that one panel of this Court cannot overrule the decision of another panel. *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985). "The prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision." *Id.* (quoting *Gist v. Sec'y of Health & Human Servs.*, 736 F.2d 352, 357-58 (6th Cir. 1984)). There have been no decisions by either this Court sitting en banc or the Supreme Court which negate *Cleland* with regard to the improper motive requirement. Moreover, if there is to be an occasion to revisit *Cleland*, it will not be in a case such as this where a plaintiff's failure to adduce evidence of causation provides an independent ground for granting summary judgment.

Clearly, Romine suffered a serious injury. SJMS, regardless of how busy its emergency room was, scarcely distinguished itself by allowing Romine to continue bleeding untended for approximately ten or fifteen minutes on two separate occasions. There is no evidence in the record, however, that the delay either exacerbated Romine's injury or impacted it in any way, nor is there evidence that SJMS forced Romine to wait for treatment on account of an improper

-11-

motive. Plaintiff has not even advanced a theory that he was treated differently from any other patients who arrived at SJMS's emergency room that day. If Romine believes SJMS simply does not run a good emergency room and that it failed to provide him a certain standard of care, state tort remedies are available. Such a complaint, however, is not the basis for an action under EMTALA. If it were, federal courts would have jurisdiction over any malpractice issue arising from treatment in an emergency room, a result Congress did not intend.

### 3. CMS Preliminary Determination Letter

Romine's third, and final, contention on appeal is that the district court erred in failing to give preclusive effect to CMS's preliminary determination letter. Without explicitly stating his argument, Romine appears to contend that the fact that CMS issued the letter constitutes an adjudication that SJMS did not provide him an appropriate medical screening. As noted above, however, an EMTALA plaintiff must provide evidence of causation of her injury and a defendant's improper motive, none of which is proved by the CMS preliminary determination letter. Furthermore, though Romine cites to the general proposition that courts give deference to agency adjudications, he does not cite a single decision in which a court adjudicating an EMTALA action gave preclusive effect to a CMS preliminary determination letter or, in fact, any CMS decision. *Chevron USA v. National Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Not all agency decisions have preclusive effect, but only those taken "[w]hen an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate." *Astoria*

*Federal Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 107 (1991) (quoting *United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 422 (1966)). The fact that CMS preliminarily found that SJMS's treatment of Romine violated 42 C.F.R. § 489.24 does not constitute an agency adjudication to which courts should grant preclusive effect, as thoroughly explained by the district court:

> The preliminary determination letter filed in the record in this case presumably constituted the first step in the termination [of participation in Medicare] process, as it provided SJMS with "preliminary notice" that its provider agreement would be terminated in twenty-three days *if* SJMS failed to correct the identified deficiencies or refute the finding of a violation. Had the termination proceeded, the next step would have been for CMS to give SJMS "a final notice of termination, and concurrent notice to the public, at least 2, but not more than 4, days before the effective date of termination of the provider agreement." SJMS could then have appealed the termination in accordance with Part 498 of Chapter 42 of the Code of Federal Regulations. The administrative appeals process includes, as applicable, mechanisms for reconsideration of the adverse decision, a hearing, and a review of any hearing decision by the Departmental Appeals Board. . . . Thus, SJMS clearly never reached the point in the termination process when the relevant administrative agency would have acted in a judicial capacity to resolve disputed questions of fact the parties had an opportunity to litigate.

We agree that nothing remotely approaching an adjudication with an opportunity to litigate had occurred at the point that SJMS entered into a corrective plan of action to address the violation referenced in the CMS letter. In fact, in accepting CMS's plan of corrective action, SJMS explicitly stated that it did not concede that the conduct at issue violated EMTALA. Romine focuses on the fact that SJMS had the opportunity to contest the CMS finding and appeal it, rather than submit to a plan of correction. This logic lies on a treacherous path. To give preclusive effect to a mere preliminary determination letter would have the perverse effect

of disincentivizing voluntary corrective action by hospitals. Once hospitals were on notice that accepting a CMS plan of correction would make them automatically liable under EMTALA, hospitals would vigorously fight each plan of correction because they would be precluded from litigating the issue of liability in a subsequent EMTALA action. Improvement in the quality of hospital services would stall during lengthy and expensive litigation. Hence, Romine argues for this Court to make a determination which would worsen, rather than improve, the quality of emergency services. Had the corrective plan been *imposed* on SJMS pursuant to a hearing and final decision, that would present a significantly different situation, but such a situation is not before us. The district court correctly decided not to grant preclusive effect to the CMS preliminary determination letter.

IV.

For the foregoing reasons we AFFIRM the district court's decision to grant summary judgment to the Defendant.