NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0492n.06

No. 15-6173

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| MARY SCOTT, for Herself and as Representative for the Estate of Melton Scott, | ) ) ) ) | **FILED** Aug 22, 2016 DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE |
| MEMORIAL HEALTH CARE SYSTEM, INC., | ) ) ) | |
| Defendant-Appellee. | ) ) | |

BEFORE:     DAUGHTREY, MOORE, and GRIFFIN, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge.  Mary Scott—both in her individual capacity and as the personal representative of the estate of her late husband, Melton Scott—brought suit against Memorial Healthcare System, Inc., raising claims under the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd, and the Tennessee Consumer Protection Act of 1977 (TCPA), Tenn. Code Ann. §§ 47-18-101–130.  The district court ultimately dismissed the TCPA claim, granted summary judgment in favor of Memorial on the EMTALA claim, and denied Scott's motions to compel production of certain hospital records and to extend the time for discovery.  On appeal, Mary Scott submits that her claims under the TCPA were timely filed, that she adduced sufficient evidence to show that Memorial's alleged EMTALA violations resulted in the deterioration of Melton's physical condition, and that she established her need for further discovery.  We disagree and thus affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On March 26, 2012, 70-year-old Melton Scott, a Medicare recipient, was waiting at Memorial Health Care in Chattanooga, Tennessee, while his wife, Mary, underwent an outpatient procedure. Sometime between 11:00 a.m. and 11:30 a.m., he became dizzy and unsteady on his feet. Because he had experienced similar symptoms "off and on a few days before," he went to the emergency room at Memorial, arriving there at 12:13 p.m., according to facility records.

Upon Melton's arrival in the emergency room, medical staff noted that he was slurring his speech and exhibited "left facial droop." Consequently, triage nurses and various physicians examined him and performed diagnostic tests, which included at least two stroke assessments, an electrocardiogram, and a computed tomography (CT) scan. Although those assessments revealed that Melton exhibited "a decreased rise of brows, and frown," and "decreased blink on the left and left facial asymmetry and slurring," Melton did not complain of weakness or chest pain, his pupils were "equal and reactive to light," his gait was normal, and he had "equal grip strength." Furthermore, the CT scan report dictated at 2:28 p.m. "indicated no evidence of acute intracranial hemorrhage, mass, mass effect or shift of inline structures." Thus, at that time, the staff at Memorial diagnosed Melton as suffering from Bell's palsy, a condition that the National Institute of Neurological Disorders and Stroke describes as "a form of temporary facial paralysis," "which is not related to stroke," with symptoms that might include drooping of the eyelid and corner of the mouth, impaired speech, and dizziness. *See* http://www.ninds.nih.gov/disorders/bells/detail_bells.html.

However, at 4:00 p.m., a doctor noted "an acute change of status," including increased slurred speech and weakness on Melton's left side. Even so, at that time, the physicians at Memorial did not administer tissue plasminogen activator (tPA) to Melton because he then was

outside the appropriate time window for prescribing that drug that is used to dissolve blood clots. Unable to provide any of the advanced treatments that Melton might need, Memorial officials then began the process of requesting a patient transfer to Erlanger Hospital. While awaiting confirmation for that transfer, a Memorial physician ordered a computed tomography angiography (CTA) scan to be performed on Melton. At 5:05 p.m., a written transcript of the test results "included the impression that there was an occlusion of the right internal carotid artery and proximal portion of the right middle cerebral artery," as well as peripheral middle cerebral artery branches that were "partially opacified."

After all transfer paperwork was completed, Memorial personnel performed a final pre-transfer assessment of Melton in accordance with the policies and procedures of the hospital. Shortly after 6:00 p.m., Melton arrived for triage at Chattanooga's Erlanger Hospital and was found to be awake, able to state his name, date of birth, and the present date, and able to name objects, read simple words, and repeat simple sentences. In short, according to an Erlanger physician who subsequently examined both the transfer records and the patient, Melton's "clinical condition was similar to what he looked like at [4:02 p.m.] in Memorial." After additional treatment and observation at Erlanger, Melton was released and returned to his home. He died eight months later on November 24, 2012, sometime after suffering a second stroke.

On March 21, 2013, Mary Scott filed a *pro se* complaint, seeking ten million dollars from Memorial Hospital, its chief executive officer, James Hobson, doctors Brian Edward Ingalls and William Kyle Korn, and registered nurse Jedediah Drumm. As grounds for her lawsuit, Mary Scott listed only "spoliation of evidence" and "alteration of medical records." Expounding upon those causes of action, her complaint asserted that Hobson "allows these doctors and nurse to work at this facility with no actions taken," that Ingalls "omitted seeing or treating Melton Scott

in records," that Korn "altered and omitted and changed times in medical records stating Melton Scott became paralized [sic] over 3 hrs. later than he was strickened [sic]," and that Drumm "changed, omitted and entered false information on medical records."

Following Memorial's answer to that initial complaint, Mary Scott sought voluntary dismissal of the case pursuant to the provisions of Rule 41 of the Federal Rules of Civil Procedure. The request for dismissal was fueled in large part by the Scott family's receipt of a notice from the Centers for Medicare & Medicaid Services of the Department of Health and Human Services stating that the federal agency was investigating a complaint that Memorial allegedly had failed to provide stabilizing treatment to Melton, had failed to ensure an appropriate transfer to Erlanger, and had failed to provide prompt medical screening before demanding payment.

The district court granted the request to dismiss the case without prejudice, and Mary Scott, then represented by counsel, filed a second complaint on October 25, 2013, alleging violations of EMTALA and TCPA, and additional state-law claims of negligence, fraud, and loss of consortium. Upon Memorial's subsequent motion, the district court dismissed all state-law claims raised in the second complaint, ruling that the October 2013 filing fell outside the one-year TCPA limitations period. According to the district court, Mary Scott's cause of action accrued on March 26, 2012, when Melton was treated at Memorial and then transferred to Erlanger, and Tennessee's savings statute could not toll the applicable limitations period that ran from that date because the second complaint raised radically different causes of action from those mentioned in the first complaint.

Later, the district court also granted Memorial summary judgment on the EMTALA claims, concluding that Mary Scott adduced no expert testimony that would allow a finding that

Melton suffered harm *as a result of an EMTALA violation*. In that summary-judgment ruling, the district court also denied Mary Scott's motion to compel discovery of Memorial records relating to the treatment of other stroke patients. Having thus disposed of all matters before it in this litigation, the district court entered judgment in favor of Memorial. Mary Scott now appeals the rulings on the motion to dismiss, the motion for summary judgment, and the motion to compel discovery, alleging that the district court erred in each disposition.

## DISCUSSION

### Tennessee Consumer Protection Act Claims

The TCPA was enacted "[t]o encourage and promote the development of fair consumer practices." Tenn. Code Ann. § 47-18-102(3). To that end, the act prohibits "unfair or deceptive acts or practices affecting the conduct of any trade or commerce," including representations "that a consumer transaction confers or involves rights, remedies or obligations that it does not have," representations "that a service. . . is needed when it is not," and the use of "statements or illustrations in any advertisement which create a false impression of the . . . quality . . . of the goods or services offered." Tenn. Code Ann. § 47-18-104(b)(12), (13), and (21).

In her second complaint, Mary Scott asserted that Memorial violated each of these three TCPA provisions. First, she alleged that Memorial violated § 47-18-104(b)(12) by representing to the public that it had a highly trained stroke team that recognized that immediate emergency treatment presented the greatest chance for recovery from a stroke. Despite that representation, Mary Scott argues that Memorial staff failed to stabilize Melton's condition and did not treat him immediately for stroke symptoms. Thus, she claims that Memorial represented that it conferred certain services and remedies that it could not provide.

Second, Mary Scott alleged that Memorial continued to provide treatment to Melton for Bell's palsy when Melton should have been treated for a stroke. Thus, she maintains on appeal that Memorial violated § 47-18-104(b)(13) by representing that Melton needed a service that he in fact did not require.

Finally, Mary Scott contended that Memorial deceptively advertised that the hospital's "[h]ighly trained stroke teams provide fast track evaluation and care of stroke patients." She claims, however, that when Melton presented himself in the emergency room suffering from stroke-like symptoms, hospital personnel mistakenly treated him for Bell's palsy. According to Mary Scott, such deceptive advertising constitutes a violation of § 47-18-104(b)(21).

The district court determined, however, that all of Mary Scott's TCPA claims must be dismissed. In reaching that conclusion, the district court relied upon the fact that the TCPA claims were not filed until October 25, 2013, seven months after the end of the one-year limitations period for challenging the alleged acts and omissions of March 26, 2012. *See* Tenn. Code Ann. § 47-18-110 (TCPA action "shall be brought within one (1) year from a person's discovery of the unlawful act or practice").

"We apply *de novo* review to a ruling dismissing claims as barred by the statute of limitations. The same *de novo* standard applies to the district court's conclusion that allegations in an amended complaint do not relate back to the original complaint." *Durand v. Hanover Ins. Grp., Inc.*, 806 F.3d 367, 374 (6th Cir. 2015) (citations and internal quotation marks omitted).

On appeal, Mary Scott disputes the district court's finding of untimeliness and argues that application of Tennessee's savings statute renders timely her second complaint raising TCPA allegations. Pursuant to the relevant portions of Tennessee Code Annotated § 28-1-105(a):

> If the action is commenced within the time limited by a rule or statute of limitation, but the judgment or decree is rendered against the plaintiff upon any

> ground not concluding the plaintiff's right of action . . . the plaintiff, or the plaintiff's representatives and privies, as the case may be, may, from time to time, commence a new action within one (1) year after the reversal or arrest.

We have recognized that this savings statute applies "after a voluntary dismissal or non-suit," thus affording the plaintiff "one year to refile the dismissed action." *In re AMC Mortg. Co.*, 213 F.3d 917, 920 (6th Cir. 2000). Mary Scott argues that, because her initial complaint was filed on March 21, 2013, less than one year after Melton's March 26, 2012, treatment in Memorial's emergency room, she had one year from the May 2013 date of voluntary dismissal of that initial action to refile her complaint. Thus, she argues, the October 25, 2013, filing of the second complaint fell well within the permissible time frame.

Despite Mary Scott's contention that the refiled complaint was timely, the district court correctly ruled that the savings statute did not apply to "save" Mary Scott's second complaint from the effects of the one-year statute of limitations. Although Tennessee Code Annotated § 28-1-105 is considered to be remedial and is given "both a broad and liberal construction," *Circle C Constr., LLC v. Nilsen*, 484 S.W.3d 914, 921 (Tenn. 2016), Tennessee courts have held that the statute is applicable only "when the original complaint and the new complaint allege substantially the same cause of action, which includes identity of the parties." *Foster v. St. Joseph Hosp.*, 158 S.W.3d 418, 422 (Tenn. Ct. App. 2004) (citation omitted). Thus, even though "[i]t is not necessary that the two complaints be identical," the savings statute will not come into play unless any new claim in a second complaint "arose out of the same conduct, transaction, or occurrence alleged in the original action." *Id.* (citing *Energy Sav. Prods., Inc. v. Carney*, 737 S.W.2d 783, 784-85 (Tenn. Ct. App. 1987)). Such a limitation is necessary because the underlying concern in the application of any savings statute is "whether the defendant had notice:

7

[N]otice to the party affected is the true test of the statute's applicability." *Id.* (citations and internal quotation marks omitted).

As the district court concluded in this matter, Mary Scott's second complaint against Memorial contained allegations that did not arise from the same facts alleged in her initial federal-court filing. That original complaint specifically mentioned only two grounds justifying a judgment in her favor: spoliation of evidence and alteration of medical records. Moreover, the facts listed in the *pro se* complaint stated only that physicians and a nurse changed, omitted, or falsified information in their records of Melton's treatment, and that the chief executive officer of the hospital nevertheless "allow[ed] these doctors and nurse to work at [Memorial] with no actions taken."

In contrast, the TCPA causes of action set forth in the subsequent complaint did not arise in any sense from the alteration or improper preparation of hospital records. Instead, Mary Scott's TCPA allegations involved: (1) a claim that Memorial's website misrepresented that its stroke team was highly trained, and by implication, competent to diagnose and treat individuals presenting with stroke symptoms; (2) a claim that Memorial's staff misdiagnosed Melton as suffering from Bell's palsy and thus provided him with treatment that was not needed; and (3) a claim that Memorial's advertisements created a false impression of the quality of the medical services the hospital could provide to stroke patients. None of these allegations bore any relation whatsoever to an assertion that hospital employees destroyed or altered patient records. Thus, the district court properly concluded that the claims in the two complaints were not related closely enough to each other, and did not arise from the same set of operative facts, so as to give proper notice to Memorial regarding the nature of the complaints. As a result, Mary Scott's

second complaint cannot be deemed timely even through operation of Tennessee's savings statute.

**EMTALA Claims**

As the United States Supreme Court has recognized, EMTALA "places obligations of screening and stabilization upon hospitals and emergency rooms that receive patients suffering from an 'emergency medical condition.'" *Roberts v. Galen of Va., Inc.*, 525 U.S. 249, 250 (1999). If an individual requests examination or treatment at a hospital emergency department, "the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department." 42 U.S.C. § 1395dd(a). If the hospital determines that the individual indeed suffers from such an emergency medical condition, it then must provide either "such treatment as may be required to stabilize the medical condition," or must provide "for transfer of the individual to another medical facility." 42 U.S.C. § 1395dd(b)(1)(A) and (B).

In her second complaint, Mary Scott claimed that Memorial provided inappropriate screening when her husband arrived at the emergency room suffering stroke-like symptoms. She also alleged that Memorial staff did not offer treatment to stabilize Melton's condition and that the hospital violated EMTALA's transfer requirements by failing to provide the proper written certifications and failing to forward Melton's medical records to Erlanger in a proper and organized fashion. The district court nevertheless granted summary judgment to Memorial on the EMTALA claims, determining that Mary Scott did not offer the expert testimony necessary to establish that the alleged EMTALA violations themselves resulted in additional injuries to Melton.

There is no dispute that Melton suffered a stroke at Memorial while his wife was undergoing an outpatient procedure. There also is no dispute that Melton presented himself at Memorial's emergency room for treatment and that he eventually died from complications arising from a second stroke suffered at a later time. What is at issue in this matter is Mary Scott's ability to point to sufficient evidence to create a genuine dispute as to whether Memorial's alleged failures to screen, stabilize, and transfer Melton appropriately caused the damages for which she seeks to recover.

The applicable provisions of EMTALA explicitly authorize civil actions against hospitals for personal harm suffered "*as a direct result of a participating hospital's violation of*" an *EMTALA requirement*. 42 U.S.C. § 1395dd(d)(2)(A) (emphasis added). Thus, Mary Scott may recover damages under EMTALA in this litigation only if she can establish that Melton suffered compensable damage, not as a result of his initial stroke, but because of Memorial's failure to provide "appropriate" medical screening, because of Memorial's failure to stabilize Melton properly while he was under Memorial's care, or because of deficiencies in the procedures used by Memorial to transfer Melton to Erlanger Hospital. However, a hospital's duty to offer "appropriate" screening and treatment to patients in an emergency-room setting does not engraft a medical-malpractice standard upon EMTALA actions. *Cleland v. Bronson Health Care Grp., Inc.*, 917 F.2d 266, 272 (6th Cir. 1990).

The district court recognized the limits of EMTALA's reach made clear by the relevant statutory language. Emphasizing that it is the plaintiff's burden to establish that it was the EMTALA violation, not the underlying medical emergency, that caused the alleged harm, the district court stated:

> The need for expert proof of causation is a significant issue under EMTALA because a plaintiff will necessarily have sustained some injury or be suffering

10

from some medical condition that led the plaintiff to seek medical attention in the first place. Distinguishing the harm caused by the initial injury and the harm caused by any subsequent failure of medical care will usually be difficult for a lay jury. Medical expert testimony on causation is accordingly necessary where the plaintiff's harm resulted, to a significant extent, from the initial injury. (Citations omitted.)

The lack of just such expert medical testimony dooms Mary Scott's EMTALA claims in this case. She does not assert that Memorial was responsible for the initial stroke Melton suffered on March 26, 2012. Thus, it was incumbent upon her to provide some evidence that the hospital's screening procedures, stabilization protocol, or transfer processes exacerbated Melton's already critical condition. In an effort to do so, Mary Scott simply alludes to the fact that Melton's condition worsened considerably around 4:00 p.m. on March 26, 2012, a time when he was under the care and observation of Memorial doctors and nurses. She also claims on appeal that she had no need to offer expert medical testimony in support of her EMTALA claims because "*no lay person needs an expert to explain that sitting in an emergency room for five (5) hours receiving absolutely no specific treatment for a stroke causes damage*."

The cases upon which Mary Scott relies for her assertion that no expert medical testimony was necessary in this case, *Runnells v. Rogers*, 596 S.W.2d 87 (Tenn. 1980), and *Morin v. Eastern Maine Medical Center*, 779 F. Supp. 2d 166 (D. Me. 2011), held that the plaintiffs in those matters could establish their damage claims without resort to expert medical testimony. The facts presented in *Runnells* and *Morin*, however, are much more egregious than those in this situation, making those cases readily distinguishable.

For example, in *Runnells*, a medical-malpractice action, the Tennessee Supreme Court held that expert medical testimony was not necessary to prove the plaintiff's claims because "common knowledge" indicated that the acts of the defendant physician failed to comply with proper standards of medical care. In the words of the majority opinion:

11

> It is within the common knowledge of laymen that where a patient is injured by a piece of wire imbedded in his foot, the foot has swollen to the point that the shoe may not be worn, the patient has difficulty in walking, there is soreness resulting from probing in an unsuccessful effort to remove it, and the foot is oozing and running, then the wire must be removed. . . .
>
> Even a barefoot boy knows that when his foot is infested by a sticker, splinter, thorn, pin or other foreign object, it must be removed. Most assuredly this lies within the ken of a layman.

*Runnells*, 596 S.W.2d at 90.

Likewise, in *Morin*, the district court concluded that jury members' "commonsense and experience" alone were sufficient to allow them to determine whether the plaintiff in that EMTALA case had suffered harm. Morin, who was 16-weeks pregnant, was informed at a hospital examination that the fetus had died. Nevertheless, because Morin "was not dilated enough," doctors instructed her to return to her home 75 minutes away, "let nature take its course," and "just dispose of" the stillborn fetus when she finally delivered it. *Morin*, 779 F. Supp. 2d at 168-70. Later that evening, Morin, already experiencing contractions, delivered the fetus on the bathroom floor of her home, "wrapped him in a cloth and placed him in a box." *Id.* at 170. Despite the fact that she continued to bleed from the stillbirth, Morin "spent the night pacing and holding the box containing her son." *Id.* Because Morin's claim was for the harm she suffered "as a result of being discharged [from the hospital] and having to miscarry at home," there is no question that the commonsense experiences of the jurors were sufficient to determine whether Morin indeed had suffered "personal harm" as a result of the hospital's premature discharge of her as a patient. *Id.* at 189. The district court in *Morin* took care, however, to distinguish the case before it from a situation in which a judge or a jury is asked to determine whether a hospital's failure to screen a patient adequately, rather than the natural progression of a condition or illness, creates the need for additional surgery. In the latter

instance, expert testimony would be required because a "technical medical question" would be presented. *Id.*

The case now before us more closely resembles the situation distinguished by the district court in *Morin* than it does *Runnells* or *Morin* itself. Because Melton presented himself to the Memorial emergency staff with symptoms that later proved to be related to a stroke, Mary Scott was required to establish that the subsequent decline in his condition was not attributable to that earlier stroke or its natural progression, but rather to the later medical steps that Memorial's staff took or did not take. To make such a determination, a juror or other finder of fact cannot rely simply upon his or her "common knowledge." Even if, as Mary Scott claims, it is known universally that administering aspirin at the time of a stroke can be beneficial, she adduced no expert medical evidence that had such a course of action been taken at 12:13 p.m., Melton's condition still would not have taken a drastic turn for the worse at approximately 4:00 p.m.

Scott's medical expert, Robert Mulliken, testified that he believed it would have been *advisable* for Memorial staff to have administered aspirin to Melton upon his presentation at the emergency room in an attempt to lessen the severity of any subsequent neurologic deficits. He also expressed his opinion that Memorial did not offer a timely neurologic consult to Melton, "did not have a timely documentation of an NIH Stroke Scale," and did not transfer Melton to Erlanger in a timely manner. Nevertheless, neither Mulliken nor any of Mary Scott's other experts answered the unasked, logical, follow-up question of whether treatment decisions or omissions by Memorial staff *actually* altered in any way the natural progression of Melton's condition after first suffering a stroke. In fact, the only evidence that did address the possible impact of Memorial's decisions on Melton's subsequent health came from Memorial's medical experts who indicated that any alleged EMTALA violations *did not* cause further harm to

Melton.   Those experts consistently stated that Melton's condition upon presentation at the emergency room did not merit more involved treatment than was offered, that appropriate procedures were undertaken as Melton's symptoms progressed throughout his hospital stay, that Melton was not put at any greater risk as a result of his transfer to Erlanger Hospital, and, most important, that "it is unlikely that any difference in management would have resulted in a change in the subsequent events of the clinical deterioration and eventual outcome."

In short, Mary Scott offered no evidence that any damages suffered by Melton after the onset of his stroke were traceable to EMTALA violations.[1]   Consequently, the district court properly granted summary judgment to the hospital on Mary Scott's federal causes of action.

**Discovery Claims**

The magistrate judge in this case directed that all discovery be completed by July 28, 2015.   That very day, however, Mary Scott filed motions to extend the discovery deadline and to compel Memorial to provide all documents in its possession that related to treatment of any "patients presenting with stroke symptoms to Memorial's Emergency Department from January 1, 2012[,] through March 27, 2012."   The district court ultimately denied both motions.

Mary Scott now contends that had her requests been granted, we now would reverse the summary-judgment ruling in favor of Memorial on her EMTALA causes of action.   Specifically, she insists that, had she been afforded the opportunity to examine hospital records of other individuals who were treated at Memorial for strokes and for Bell's palsy, she would have been able to establish an EMTALA violation by showing that Melton, a Medicare patient, did not receive the same high-quality medical services that private-paying patients received.

---

[1] The notice of alleged noncompliance with EMTALA regulations received by Memorial from the Centers for Medicare & Medicaid Services cannot serve as evidence of EMTALA violations in this litigation.   The agency notice itself states explicitly that administrative action may by avoided "by successfully proving that the deficiencies did not exist."   Consequently, the notice itself is not evidence of the existence of violations, but rather only of the fact that nonfrivolous allegations of regulatory violations had been made, even if not proven.

Any possible error in the denial of her discovery request is, however, harmless. As recognized by the district court, the problem facing Mary Scott when advancing her EMTALA claims was that she offered no evidence to demonstrate that the physical injuries suffered by Melton resulted from EMTALA violations rather than from the natural progression of the physical effects of the stroke Melton experienced prior to presenting himself at the emergency room. Receipt of the requested hospital records of other individuals treated at Memorial for strokes, even had those records shown that wealthier patients received better medical treatment than did Melton, would not have led to a remedy of that evidentiary deficiency. Consequently, provision of the documents to which Mary Scott claims she was entitled would not have altered the outcome of the district court's summary-judgment determination.

**CONCLUSION**

The district court did not err in concluding that Mary Scott's TCPA claims were time-barred and that she failed to offer the evidence necessary to prove an EMTALA violation. We therefore AFFIRM.