NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0353n.06

No. 21-5007

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| ALVIN GALUTEN, on behalf of the ESTATE OF HORTENSE GALUTEN | ) ) ) | **FILED**<br>Jul 20, 2021<br>DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE |
| WILLIAMSON COUNTY HOSPITAL DISTRICT, et al. | ) ) | |
| Defendants-Appellants. | ) ) | |

BEFORE:  BATCHELDER, WHITE, and DONALD, Circuit Judges.

HELENE N. WHITE, Circuit Judge.

Alvin Galuten's (Galuten's) mother, Hortense Galuten (Mrs. Galuten), died after being discharged from her nine-day hospital stay at Williamson Medical Center (WMC).  Galuten sued as personal representative of his mother's estate, alleging age discrimination in violation of the Affordable Care Act (ACA) and violations of the Emergency Medical Treatment and Active Labor Act (EMTALA).  The district court dismissed the ACA claim for failure to exhaust, denied the estate's motion to exclude WMC's experts, and granted WMC's motion for summary judgment on the EMTALA claims.  Galuten appeals, and we AFFIRM.

## I.  FACTUAL BACKGROUND

### A.  Mrs. Galuten's Hospital Admission, Transfer, and Deterioration.

For about a week prior to June 2, 2016, Mrs. Galuten, a 93-year-old woman with a history of dementia, had been suffering from severe lethargy, weakness, and poor intake of food and water.

On June 2, 2016, Galuten took her to the WMC emergency room, where she was diagnosed with several medical conditions, including severe malnutrition and hypernatremia (severe dehydration causing critically elevated sodium levels).[1]  These conditions were serious and required inpatient hospital admission; people with severe hypernatremia face a mortality risk of up to 40%.  Accordingly, Mrs. Galuten was transferred from WMC's emergency department to its intensive-care unit.

Mrs. Galuten was treated with "gradual replacement of water by oral intake and by intravenous fluids, and frequent monitoring by blood lab testing."  R. 84-1 PID 418.  She was also placed on a feeding tube to treat her malnutrition.  While at the hospital, Mrs. Galuten developed several additional serious medical conditions, including acute renal (kidney) failure and pancreatitis, and was placed on dialysis.  Her conditions caused abdominal pain, nausea, and vomiting spells involving "coffee-grounds emesis" (vomit darkened with blood), a symptom common for someone with her conditions.  R. 97-1 PID 505-07; R. 84-1 PID 418-20.

Mrs. Galuten also had breathing problems.  She developed hypoxia (low oxygen saturation levels) and was placed on supplemental oxygen for the duration of her stay.  Doctors performed several chest x-rays between June 3 and June 11; by June 6, the x-rays began to show "pleural effusions" (fluid in lining surrounding lungs) and "pulmonary edema" (fluid in the lungs).  R. 97-1 PID 506; R. 97-4 PID 529; R. 84-1 PID 421-22.

Though Mrs. Galuten's conditions were serious, she began to improve.  She "tolerated dialysis well" and her kidney function recovered.  R. 97-1 PID 507.  Her pancreatitis also "resolved," according to her medical records.  R. 97-1 PID 505.  Her severe dehydration improved,

---

[1] Mrs. Galuten's records show admission diagnoses of (1) "[s]evere hypernatremia due to dehydration"; (2) "[d]ecreased oral intake"; (3) malnutrition; (4) "CKD stage IV"; (5) "Leukocytosis"; (6) "Hemoconcentration"; (7) "Hypertension"; (8) "Lewy body dementia"; and (9) "[p]ossible parkinsonism."  R. 97-1 PID 505.

and she started eating some solid food, though she remained malnourished. Her abdominal pain and nausea persisted, but her vomiting was of a smaller volume than it was earlier in her stay. Her lung conditions persisted, but doctors described these conditions as "mild" or "moderate" and believed that they were "due to her poor nutritional state." R. 97-5 PID 536; R. 97-4 PID 529; 97-1 PID 506-07. At some point near the end of Mrs. Galuten's stay, Galuten agreed with the hospital that it made sense for Mrs. Galuten to be transferred to a skilled nursing facility. According to her hospital records, Mrs. Galuten was "quite looking forward to SNF [skilled nursing facility] placement," R. 97-1 PID 507, and they chose Somerfield Health Center. Her transfer was set for June 11.

Mrs. Galuten continued to suffer abdominal pain and nausea in the early morning hours of June 11. At around 4:00 a.m., a doctor ordered an abdominal scan. His contemporaneous report noted Mrs. Galuten's history of "emesis" and abdominal pain and opined that the cause of her current discomfort was "possibly constipation." R. 97-3 PID 525. Around 7:00 a.m., another doctor ordered a chest x-ray that showed increased "[m]oderate right pleural effusion." R. 97-5 PID 536. His contemporaneous report noted Mrs. Galuten's history of hypoxia. Galuten—usually by his mother's bedside—was dropping his wife off at the airport when both scans occurred. He later testified that nobody told him about either scan and that he would have tried to stop his mother's transfer to Somerfield had he known about them.

Later that morning, Dr. Levi Benson performed a 38-minute discharge evaluation. Mrs. Galuten appeared "[p]leasant" and "in no acute distress." R. 97-1 PID 507. She had "normal vital signs" and her oxygen saturation, while still supplemented with two liters of oxygen, had returned to "100 percent." R. 97-4 PID 529. Dr. Benson reviewed the scans done earlier that morning, but neither worried him; both reflected "ongoing" conditions. *Id.* The pleural effusions were not new

and, in his view, did not require "immediate or emergent further evaluation or treatment." *Id*. The nausea, though persisting, had improved; Mrs. Galuten's vomiting was "much larger [in] volume earlier in her stay" and by the end of her stay, she had "been able to tolerate oral intake [of food] much more frequently than when she had nausea and vomiting" earlier on. R. 97-4 PID 530. Her vomiting was also an "extremely common affliction" treatable with medications the hospital prescribed for use after discharge. R. 97-4 PID 531. Dr. Benson was confident "to a reasonable degree of medical probability" that Mrs. Galuten "would not deteriorate" during her transfer. R. 97-4 PID 529-30.

Mrs. Galuten arrived at Somerfield via ambulance on June 11. She had vomit on her clothing that had not been there when she entered the ambulance. As of 12:42 p.m., she had been admitted and placed in a bed at Somerfield. She arrived with fatigue and generalized weakness but exhibited "no noted physical attributes of pain/discomfort," and displayed "even and unlabored" breathing. R. 97-6 PID 539.

As the day progressed, Mrs. Galuten's condition deteriorated. By 4:30 p.m., she was "very agitated" and moving about in her bed, though she was able to eat 75% of her meal. *Id.* From 7:35 p.m. to 7:50 p.m., she suffered from a severe vomiting episode—again coffee-grounds emesis—and was yelling in significant distress. Somerfield medical personnel arrived, and while they were there, Mrs. Galuten became unresponsive and her pulse stopped. Somerfield's staff performed CPR, which continued as EMS workers took her to a nearby hospital via ambulance. After roughly an hour of unsuccessful resuscitation efforts, she was pronounced dead at 8:59 p.m., June 11.

An autopsy report described the cause of death as "acute peritonitis due to acute . . . chronic pancreatitis," with "contributory cause[s] of death" including "chronic kidney disease,

malnutrition and dementia." R. 97-7 PID 543 (capitalizations omitted). It noted that Mrs. Galuten's lungs contained "evidence of aspirated foreign material." R. 97-7 PID 546. One of WMC's expert witnesses later concluded that Mrs. Galuten's fatal cardiopulmonary arrest was "most likely from the aspiration of large volume emesis" during her vomiting episode. R. 84-1 PID 422.

### B. The Estate's Lawsuit.

In June 2018, Galuten, as executor of his mother's estate, filed suit in federal court. He brought claims for age discrimination in violation of the ACA and inadequate screening and stabilization in violation of EMTALA.[2] He sued two main groups of defendants: (1) WMC and a registered nurse it employed; and (2) several physicians (and their employer, Sound Physicians) who treated Mrs. Galuten at WMC. He also sued an ambulance service, First Call, which defaulted.

The remaining defendants moved to dismiss, arguing that Galuten failed to exhaust his ACA claim and failed to state a claim for violation of EMTALA. Defendants argued that EMTALA does not provide a cause of action against individual defendants. The district court dismissed the ACA claim for failure to exhaust, which it viewed as a jurisdictional defect. It dismissed the EMTALA claims against all individual defendants—and Sound Physicians—but allowed the EMTALA claims against WMC to proceed to discovery.

During discovery, WMC produced expert reports from Dr. Sanford Kim and Dr. Tracey Doering. Dr. Kim is a board-certified physician specializing in internal medicine and palliative care who has treated many patients with the same medical conditions Mrs. Galuten experienced. Dr. Doering—a faculty member and Program Director of the University of Tennessee's internal

---

[2] In addition, Galuten brought a § 1983 claim that he later abandoned as time-barred.

medicine residency—is a board-certified physician with specialties in internal medicine and geriatrics. She maintains a private practice along with her teaching duties and is "extremely familiar" with patients of the same age and with the same medical conditions as Mrs. Galuten. R. 84-2 PID 427.

Kim and Doering both concluded, to a reasonable degree of medical certainty, that Mrs. Galuten's conditions had stabilized by the time of her transfer and that the decision to discharge her was medically appropriate. They also both concluded that Mrs. Galuten died after a "catastrophic event" (her vomiting spell, which led to cardiac arrest) that likely would have occurred even had she not been transferred. Dr. Doering concluded that "this catastrophic event could not have been avoided, even if Mrs. Galuten had remained at Williamson Medical Center that day. Discharge and transport to the Somerfield Health Center did not affect the outcome of this patient." R. 84-2 PID 428. Dr. Kim said the same:

> At the time of discharge, there were no acute symptoms of sufficient severity such that the absence of immediate medical attention could reasonably be expected to place Mrs. Galuten in serious jeopardy or harm. . . . To a reasonable degree of medical certainty, at the time of discharge, there was no reason to believe that Mrs. Galuten's condition would likely deteriorate.
>
> The cardiopulmonary arrest on the evening of June 11, 2016, was not reasonably foreseeable at the time of discharge. Even if she had remained in the hospital, the same catastrophic event likely would have occurred and resulted in the same outcome. The discharge and transport of Mrs. Galuten to the skilled nursing facility did not cause or contribute to her death.

R. 84-1 PID 423-24. Galuten did not offer any experts to rebut these conclusions.

WMC moved for summary judgment. Galuten responded and filed a motion to exclude WMC's experts on the basis that neither was "certified in emergency medicine," and neither had any expertise regarding EMTALA legal compliance. R. 100 PID 564. The district court denied the motion to exclude WMC's experts. It granted WMC's summary-judgment motion on the basis

that Galuten failed to rebut WMC's expert testimony with his own experts, reasoning that the EMTALA claims turned on "medical judgment" beyond the common knowledge of lay jurors. R. 108 PID 637-38.  Galuten appealed.

## II.  DISCUSSION

Galuten first argues that the estate's ACA claim for age discrimination is not subject to an exhaustion requirement.  He then challenges the district court's denial of his motion to exclude WMC's experts.  Finally, he argues that the court erred in granting WMC's summary-judgment motion.  We take each argument in turn.

### A.  ACA Claim

The district court dismissed the ACA claim for failure to exhaust administrative remedies. Galuten does not contend that he exhausted administrative remedies; instead, he argues that the ACA claim was not subject to an exhaustion requirement.  We review that legal argument de novo. *Hitchcock v. Cumberland Univ. 403(b) DC Plan*, 851 F.3d 552, 559 (6th Cir. 2017) (applying de novo review to "predominant issue" of "whether exhaustion principles should apply" to certain claims, "which is a question of law"); *cf. Harrow v. Prudential Ins. Co. of Am.*, 279 F.3d 244, 248 (3d Cir. 2002) ("We review de novo the applicability of exhaustion principles, because it is a question of law.").

Section 1557 of the ACA provides that "an individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964[], title IX of the Education Amendments of 1972[], the Age Discrimination Act of 1975[], or section 794 of title 29 [Rehabilitation Act], be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance[.]"  42 U.S.C. § 18116(a).  In a second sentence, it adds: "The enforcement mechanisms provided for and

available under such title VI, title IX, section 794, or such Age Discrimination Act shall apply for purposes of violations of this subsection." *Id.* In other words, Section 1557 prohibits discrimination in the provision of healthcare based on "race, color, and national origin (Title VI); sex (Title IX); age (Age Discrimination Act); and disability (Rehabilitation Act)," and it incorporates the "enforcement mechanisms" provided for under these statutes. *Doe v. BlueCross Blue Shield of Tenn., Inc.*, 926 F.3d 235, 238 (6th Cir. 2019).

In *BlueCross*, we determined that a plaintiff bringing a Section 1557 claim must use the enforcement mechanism provided by the anti-discrimination statute on which she bases her ACA claim. *Id.* at 239-40. "Had Congress wished to make all of the enforcement mechanisms available" for all Section 1557 claims, we reasoned, "it would have said '[t]he enforcement mechanisms provided for and available under title VI, title IX, section 504, *and* such Age Discrimination Act shall apply'—instead of using the *or* it opted to use." *Id.* at 239.

Under *BlueCross*, the answer here is clear. The estate's ACA claim is based on age discrimination, the "ground prohibited under" the Age Discrimination Act (ADA). Thus, the ADA's enforcement mechanisms apply to this claim. The ADA (in a subsection entitled "Enforcement") provides that "[n]o action . . . shall be brought . . . if administrative remedies have not been exhausted." 42 U.S.C. § 6104(e)(2). Accordingly, because Galuten based his ACA claim on the type of age discrimination prohibited by the ADA, the ADA's "enforcement mechanisms," including its exhaustion requirement, apply to this claim.

Galuten fails to make any compelling argument to the contrary. He never mentions *BlueCross* on appeal, instead inaccurately stating that "no court of appeals has fully analyzed discrimination claims under Section 1557[.]" Galuten Br. at 12. His only argument is a conclusory assertion that it is "undisputed that Congress did not include an administrative remedy

requirement" in Section 1557 (*id.* at 11), a proposition that is clearly in dispute.  Galuten fails to address Section 1557's "enforcement mechanism" language or our interpretation of that language.

Under *BlueCross*, the district court did not err in dismissing the ACA claim for failure to exhaust.[3]

## B.  Expert Reports

The next issue is whether the district court should have granted Galuten's motion to exclude WMC's experts.  We review that decision for abuse of discretion, "recognizing, of course, that such review calls for deference to the district court's decision."  *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 781 (6th Cir. 2002).  We will reverse only if "we are left with a definite and firm conviction that [the court] committed a clear error of judgment."  *Id.*

The "opinion testimony of a doctor (whether an expert or a treating physician) generally must pass muster under [Federal Rule of Evidence] 702."  *Madej v. Maiden*, 951 F.3d 364, 369 (6th Cir. 2020).  Under Rule 702, a party calling an expert witness must show that (1) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (2) the "testimony is based on sufficient facts or data";

---

[3] It is far less clear, however, that the court was correct to dismiss under Rule 12(b)(1) for lack of subject-matter jurisdiction.  *See* R. 61 PID 327 ("Exhaustion of administrative remedies under the Age Discrimination Act is a prerequisite for jurisdiction.").  The district court cited two of our unpublished table decisions from 1997 and 1998 in support of that assertion.  *See id.* (citing *Williams v. Trevecca Nazarene College*, 162 F.3d 1162 (Table), 1998 WL 553029, at *2 (6th Cir. Aug. 17, 1998); *Simmons v. Middle Tenn. State Univ.*, 117 F.3d 1421 (Table), 1997 WL 400105, at *3-4 (6th Cir. July 11, 1997)).  Although both state that the ADA's exhaustion requirement is jurisdictional, neither offers any reasoning for that conclusion, and both appear to rely on the type of loose usage of the word "jurisdictional" that more recent decisions of the Supreme Court and our Circuit have sought to curb, beginning with the Supreme Court's 2006 decision in *Arbaugh v. Y&H Corporation*, 546 U.S. 500, 515 (2006).  *See Brentwood at Hobart v. NLRB*, 675 F.3d 999, 1003 (6th Cir. 2012) (noting that after *Arbaugh*, we generally look for a clear statement before deeming a limitation "jurisdictional"); *see also Kentucky v. U.S. ex rel. Hagel,* 759 F.3d 588, 597-98 (6th Cir. 2014).  It is questionable whether the ADA's exhaustion requirement provides the type of clear statement necessary to make it "jurisdictional" post-*Arbaugh*.  *Compare, e.g., Woodford v. Ngo*, 548 U.S. 81, 101 (2006) (stating that the Prison Litigation Reform Act's similarly worded exhaustion requirement "is not jurisdictional"); *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 401-02 (6th Cir. 2008) (holding, under *Arbaugh*, that the Age Discrimination in Employment Act's exhaustion requirement is not jurisdictional).  But because this issue would not alter our outcome, we need not resolve it today.

(3) the testimony is "the product of reliable principles and methods"; and (4) the "expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(a)–(d). Boiled down, the court "must find the expert to be: (1) qualified; (2) her testimony to be relevant; and (3) her testimony to be reliable." *United States v. LaVictor*, 848 F.3d 428, 441 (6th Cir. 2017) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)).

Galuten's only argument is that WMC's experts are not "qualified" because they are not emergency-room doctors and are not experts in EMTALA legal compliance. Neither contention warrants reversal. Mrs. Galuten had already been admitted and had spent most of her visit as an in-patient before her transfer, so it was not necessary for either expert to possess emergency-medicine certifications. And neither of WMC's experts purported to testify about legal compliance with EMTALA. Rather, both offered opinions on the relevant factual questions under the statute—whether Mrs. Galuten's condition stabilized, whether WMC's doctors used appropriate medical judgment in discharging her, and whether her discharge contributed to her ultimate decline. The experts' qualification to offer those medical opinions comes from board certification in internal medicine and experience treating patients like Mrs. Galuten, not knowledge of EMTALA's legal requirements.

Galuten fails to show that the district court abused its discretion by refusing to strike WMC's experts.

### C. Summary Judgment on EMTALA Claims

Finally, Galuten argues that the district court erred in granting WMC summary judgment on the EMTALA claims. We review that question de novo, reading the record in Galuten's favor. *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 416 (6th Cir. 2020).

Congress passed EMTALA in 1986 in response to concerns over "patient-dumping"—i.e., reports that hospitals were turning away indigent patients at emergency rooms, failing to provide the same kind of screening they would offer to a paying patient, and "dumping indigent patients from one hospital to the next while the patients' emergency conditions worsened." *Bryan v. Rectors and Visitors of Univ. of Va.*, 95 F.3d 349, 351-52 (4th Cir. 1996) (citations omitted); *Cherukuri v. Shalala*, 175 F.3d 446, 448 (6th Cir. 1999).

EMTALA imposes two basic duties on hospitals: (1) provide an "appropriate medical screening examination within the capability of the hospital's emergency department" to "any individual [who] comes to the emergency department" to seek examination or treatment; and (2) for individuals who have an "emergency medical condition," to stabilize the condition before transferring or discharging the patient. 42 U.S.C. §§ 1395dd(a), (b)(1), & (c)(1); *Cleland v. Bronson Health Care Grp., Inc.*, 917 F.2d 266, 268 (6th Cir. 1990). The statute provides a cause of action to "[a]ny individual who suffers personal harm as a direct result of a participating hospital's violation of" the statute's requirements. 42 U.S.C. § 1395dd(d)(2)(A). Galuten brought inadequate screening and stabilization claims. We discuss each separately.

### 1. The Screening Claim

Although most other Circuits disagree, we require a plaintiff bringing an EMTALA screening claim to prove that the hospital had an improper motive behind the inadequate screening. *Cleland*, 917 F.2d at 271-72; *Elmhirst v. McLaren N. Mich.*, 726 F. App'x 439, 443 (6th Cir. 2018) (noting that most Circuits disagree with *Cleland*). WMC points out that Galuten offered no proof of improper motive, which Galuten does not dispute. Rather, he argues that *Cleland* was wrongly decided and that there is no "improper motive" requirement for this claim. But "*Cleland* . . . remains the law in this circuit, and we are obligated to apply it." *Elmhirst*, 726 F. App'x at 444.

It imposes an improper-motive requirement that Galuten did not satisfy. Thus, summary judgment was proper for this claim.[4]

### 2. The Stabilization Claim

The district court granted summary judgment on the stabilization claim because Galuten failed to offer any evidence rebutting WMC's experts, who concluded that Mrs. Galuten was stable when transferred and that the transfer did not contribute to her death. Galuten argues that expert testimony was not necessary for this claim to survive summary judgment. We disagree. Galuten's failure to present expert testimony created two problems: he failed to rebut WMC's expert opinions that (i) Mrs. Galuten was "stabilized" and (ii) her transfer did not cause her death. In this case, both issues turned on technical questions of medical judgment beyond the knowledge of a lay jury.

*Stabilization*. The stabilization claim is not subject to *Cleland*'s improper-motive requirement. *Roberts v. Galen of Va., Inc.*, 525 U.S. 249, 252-53 (1999). Rather, Galuten had to show that the hospital transferred Mrs. Galuten when she was not "stabilized." 42 U.S.C. § 1395dd(b)–(c)(1). "Stabilized" "means, with respect to an emergency medical condition . . . , that no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer[.]" *Id.* § 1395dd(e)(3)(B).

This definition "establishes an 'objective' standard of 'reasonableness' based on the situation at hand." *Cherukuri*, 175 F.3d at 450 (citation omitted). A physician may transfer a patient "if he reasonably believes that the transfer is not likely to cause a 'material deterioration of the patient's condition,'" a "relative concept that depends on the situation." *Id.* at 450 & n.2

---

[4] The district court resolved this claim on the basis that Galuten failed to present any expert testimony supporting it, but we may affirm on any ground supported by the record. *Wallace v. Oakwood Healthcare, Inc.*, 954 F.3d 879, 886 (6th Cir. 2020). Galuten's failure to satisfy *Cleland*'s improper-motive requirement is the most immediately obvious defect in the screening claim. In any event, for the reasons discussed below, we also agree with the district court that Galuten's failure to present expert testimony to show that the screening was not appropriate and that any alleged inadequate screening caused Mrs. Galuten's subsequent decline would also be fatal to the claim.

(citation omitted). Because the statute expressly asks a medical question—whether deterioration was likely "*within reasonable medical probability*," 42 U.S.C. § 1395dd(e)(3)(B) (emphasis added)—the stabilization requirement "entails medical judgment" usually "understood . . . only through expert testimony." *Smith v. Botsford Gen. Hosp.*, 419 F.3d 513, 519 (6th Cir. 2005).[5]

Here, both of WMC's experts testified that in their view, to a reasonable degree of medical certainty, Mrs. Galuten's internal ailments had sufficiently stabilized by the time of her transfer. *See* R. 84-1 PID 424 (Dr. Kim) ("To a reasonable degree of medical certainty, at the time of discharge, there was no reason to believe that Mrs. Galuten's condition would likely deteriorate."); R. 84-2 PID 428 (Dr. Doering) ("Based upon my review of the record, including Mrs. Galuten's medical records, Mrs. Galuten was medically stable, no emergency condition existed, and she was an appropriate patient for discharge on June 11, 2016.").

Dr. Kim provided detailed discussions of each of Mrs. Galuten's conditions, the treatment she received for each, and the reasons he believed each condition had stabilized by the time of her transfer. *See, e.g.*, R. 84-1 PID 417-18 (noting that Mrs. Galuten returned to a "sodium level of 142" by June 4, indicating that her hypernatremia "normalized"); *id.* PID 418 (noting that "[a]fter two dialysis sessions, her creatinine and her potassium normalized, indicating [that her] hyperkalemia and acute renal failure had resolved"); *id.* at PID 419 (noting that by June 8, Mrs. Galuten's "amylase and lipase levels normalized" and that this, along with subsequent examinations, indicated "resolution of her acute pancreatitis").[6]

---

[5] *See also Cruz-Vasquez v. Mennonite Gen. Hosp., Inc.*, 613 F.3d 54, 56 (1st Cir. 2010) ("[E]xpert testimony is generally required to assess certain elements of an EMTALA claim.").

[6] Dr. Kim offers similar discussions of the other conditions Mrs. Galuten had. *See, e.g.*, *id.* at PID 418-20 (discussing her pain, nausea, and vomiting, explaining that the risks of determining the precise cause of her hematemesis (blood in vomit) "far outweighed the benefits" of the diagnostic procedure that would have been used, and concluding that it was appropriate to treat these symptoms, which were common for someone with her underlying medical issues, with medications); *id.* PID 420-21 (describing treatment of Mrs. Galuten's severe malnutrition and

It is not within lay jurors' common knowledge to determine whether someone's "creatinine and potassium" levels show that their hyperkalemia and renal failure have resolved. Nor would we expect them to know what "amylase and lipase levels" are, let alone what levels indicate "resolution . . . of acute pancreatitis." And we surely would not expect jurors to possess the type of medical expertise necessary to disagree, on their own, with Dr. Kim's conclusions that it was medically reasonable to find that these medical conditions had stabilized.

Galuten points to his mother's abdominal scan and chest x-ray the morning of her transfer, arguing that a jury could infer from the fact that she received these scans that she should not have been transferred. But Dr. Kim concluded—and Dr. Benson testified—that neither of these scans revealed new or unstable medical conditions that would have created a concern that Mrs. Galuten would deteriorate during transfer. Perhaps an opposing medical expert could have explained why WMC's experts should not be believed, but lay jurors with no medical training are not qualified to make that judgment.

*Causation*. Galuten also faces a causation problem. Twice before, in unreported decisions, we have affirmed grants of summary judgment against plaintiffs who, like Galuten, failed to offer any expert testimony establishing that the defendant's ultimate injury was caused by an alleged EMTALA violation, as opposed to the medical conditions bringing them to the hospital in the first place. *Romine v. St. Joseph Health Sys.,* 541 F. App'x 614, 618-19 (6th Cir. 2013); *Scott v. Mem'l Health Care Sys., Inc.*, 660 F. App'x 366, 372-74 (6th Cir. 2016).

---

concluding that this condition—while "difficult [to treat] in elderly and sick patients"—had become "medically stable at the time of her discharge"); *id.* at PID 421-22 (explaining that Mrs. Galuten developed hypoxemia (low oxygen) on June 4, describing treatment, noting that her "oxygen requirement over the last few days of her admission had improved," and that "[d]ischarging Mrs. Galuten on supplemental oxygen was entirely appropriate since her oxygen needs had stabilized. The need for supplemental oxygen is very common for patients like Mrs. Galuten.").

In *Romine*, we affirmed a grant of summary judgment against a plaintiff who cut his hand with scissors, was bleeding profusely, experienced lengthy delays at an emergency room, and was eventually airlifted to another hospital to receive sutures. 541 F. App'x at 616-19. We noted that although there is no bright-line rule requiring expert testimony on the issue of causation, experts may be necessary when causation turns on questions of medical judgment beyond a jury's common knowledge. *Id.* at 618-19. We held that the plaintiff's case fell into that category and that his claim failed because he failed to offer any experts. *Id.*

We held the same in *Scott*, 660 F. App'x at 372-74. There, a plaintiff with potential stroke symptoms sought attention at a hospital. The hospital performed several tests but ultimately concluded that the patient had not suffered a stroke and transferred him to another provider, who discharged him that day. *Id.* at 368-69. The patient died eight months later, "sometime after suffering a second stroke." *Id.* at 369. We affirmed the dismissal of his wife's screening and stabilization claims because she offered no expert testimony that the alleged violations "exacerbated [his] already critical condition." *Id.* at 373. She was required to show that the "subsequent decline in . . . condition was not attributable to that earlier stroke or its natural progression, but rather to the later medical steps that [the hospital's] staff took or did not take." *Id.* at 374. That required an expert; "a juror . . . cannot rely simply upon his or her 'common knowledge'" to make such a determination. *Id.*

Both decisions distinguished cases involving questions that *could* turn on common knowledge. The first, a district court EMTALA case, held that no expert was necessary to determine that a hospital caused a pregnant patient emotional harm when it discharged her and directed her to deliver and dispose of her stillborn fetus by herself in her home; the court held jurors could rely on their own experience to understand that this decision could cause emotional

harm. *Morin v. E. Me. Med. Ctr*, 779 F. Supp. 2d 166, 168-70, 189 (D. Me. 2011). *Morin* distinguished a case with a more "technical medical question" that, it said, *would* require an expert: whether a patient with pains consistent with myocardial infarction could show that an inadequate screening led to his later heart surgery. *Id.* at 189 (citing *Torres Otero v. Hosp. Gen. Menonita*, 115 F. Supp. 2d 253, 260 (D.P.R. 2000)). *Scott* and *Romine* held that their respective facts were closer to the latter scenario. *Scott*, 660 F. App'x at 374; *Romine*, 541 F. App'x at 619.

The *Scott* plaintiff also cited a state case holding that a jury could find on its own that a doctor should have removed a piece of wire from a patient's swollen and oozing foot. *See Runnells v. Rogers*, 596 S.W.2d 87, 90 (Tenn. 1980) ("Even a barefoot boy knows that when his foot is infested by a . . . foreign object, it must be removed. Most assuredly this lies within the ken of a layman."). We distinguished *Runnells* for the same reason: it was far more "egregious" and did not involve the same type of technical medical question. 660 F. App'x at 373-74.

Galuten relies on *Morin* and *Runnells*. But this case is far closer to *Scott* and *Romine*. The causation question here is whether WMC's discharge of Mrs. Galuten contributed to her decline or whether that decline was an unavoidable progression of her many conditions. That is at least as dependent on questions of technical medical judgment as the causation question in *Scott*. And the conditions here (hypernatremia, hyperkalemia, acute renal failure, pleural effusions and pulmonary edema, hematemesis) are far less immediately comprehensible to a lay jury than the injury in *Romine* (a bleeding hand lacerated by scissors). Simply put, causation here turned on technical medical questions a lay jury is not equipped to answer. Thus, as in *Scott* and *Romine*, expert causation testimony was necessary.[7]

---

[7] *Scott* and *Romine*, to be sure, are unpublished decisions, but they are consistent with the decisions of some other Circuits, which have also recognized that EMTALA claims may require expert testimony regarding causation. *See Ortiz-Lopez v. Sociedad Espanola de Auxilio Mutuo Y Beneficiencia de P.R.*, 248 F.3d 29, 36-37 (1st Cir. 2001)

Accordingly, the district court did not err in granting WMC's summary-judgment motion based on Galuten's failure to demonstrate a genuine issue of material fact.

### III. CONCLUSION

For the reasons above, we AFFIRM.

---

("Without an expert witness through which to enter medical records or provide an opinion in support of their allegations that the defendant failed to 'appropriately screen' and 'stabilize' [the] emergency condition, allegedly causing [the patient's] death, plaintiffs could not satisfy their burden of proving an EMTALA violation."); *Parker v. Cent. Kan. Med. Ctr.*, 57 F. App'x 401, 406 (10th Cir. 2003) (holding that a remand in an EMTALA case would be "futile" because the plaintiff "fail[ed] to properly or timely identify a medical expert witness[ or provide] expert medical testimony establishing a nexus between CKMC's . . . alleged violation of EMTALA and Mrs. Parker's medical complications . . . .").